HEARD APRIL TERM, 1873.

## Morton, Bliss & Co. *vs.* Comptroller General.

Sec. 20, Art. II, of the Constitution of the State, that "Every Act or resolution having
the force of law shall relate to but one subject, and that shall be expressed in the
title," does not render unconstitutional and void a provision in an Act entitled "An
Act to provide for the appointment of a Land Commissioner, and to define his pow-
ers and duties," authorizing a public debt to be contracted for the uses and purposes
of the office created by the Act.

So, also, authority to contract a public debt, for the uses and purposes of the same
office, may be introduced into a later Act entitled "An Act to amend an Act enti-
tled 'An Act to provide for the appointment of a Land Commissioner, and to define
his powers and duties,' and for other purposes."

The extent and scope of the terms "subject" and "expressed in the title," in the
sense of the above recited provision of the Constitution, considered and declared.

A declaration in an Act authorizing a public debt to be contracted, "That an annual
tax, in addition to all other taxes, shall be levied upon the property of the State,
sufficient to pay the interest on the loan hereinbefore authorized, at the times when
such interest shall fall due," is a compliance with the direction of Section 7, Article
IX, of the Constitution of the State, that "every such law shall levy a tax, annu-
ally, sufficient to pay the annual interest of such debt," there being at the time of
the passage of the Act a general law of force, under which it became the duty of
an Executive officer of the State to fix the amount of the tax and order its collec-
tion.

So, also, a declaration in an Act to borrow money on bonds of the State, "That the
faith and credit of the State is hereby pledged for the payment of principal and
interest on said bonds, and a sufficient amount of taxes is hereby levied to pay
the interest accruing on said bonds annually," is a compliance with the above
recited direction in Section 7, Article IX, of the Constitution of the State.

The intent of the Constitution in the above last recited direction was to secure an ex-
haustive exercise of the power, so that there should be no need for further legisla-
tion to fix the amount of the tax, or enforce its collection, and such power is ex-
hausted by the terms of each of the Acts above mentioned, and the provisions of
the general tax law of the State.

The inhibition of the Constitution of the United States that "No State shall pass any
law impairing the obligation of contracts," inheres in a debt of the State created
under an Act providing, as the Constitution of the State directs, for the levy of "a
tax, annually, sufficient to pay the annual interest on such debt," and prevents
the Legislature of the State from depriving the public creditor of his remedy to
enforce the collection of the tax under the law of force at the passage of the
Act.

The provision in Section 4, Article IX, of the Constitution of the State, that "No tax
shall be levied except in pursuance of a law which shall distinctly state the object
of the same, to which object such tax shall be applied," is an "appropriation
made by law" of the money raised by a tax to pay the interest of a public debt,
and makes it the duty of the State Treasurer to apply such money to the specific
object mentioned in the Act directing the levy of the tax, and such duty can be en-
forced by the Courts.

The provision in Section 7, Article IX, of the Constitution of the State, that no law to
create a public debt "shall take effect until it shall have been passed by the vote
of two-thirds of the members of each branch of the General Assembly, to be re-
corded by yeas and nays," &c., requires only a vote of two-thirds of a quorum of
each House, and not a vote of two-thirds of the whole membership of each
House.

Where an Act to create a public debt, by a loan on bonds of the State, is passed in the
mode prescribed by the Constitution of the State, but some requirement of the Act,
as, for instance, that the bonds shall be sold at the highest market price, is not

complied with by the officer charged with its execution, it is competent for the Legislature, by an Act, not passed by the vote of two-thirds of the members of each House, to waive the objection and validate the bonds.

*Mandamus* is the proper remedy to compel the officer charged, by law, with the performance of the duty, to direct the levy of a State tax to pay the interest of a public debt.

To be entitled to the writ of *mandamus* the relator must show that the respondent is bound to the performance of some certain specified duty of a ministerial character, imposed by law, in the performance of which the relator has a legal interest.

A duty imposed by law upon an officer is specific when a case or state of circumstances exists proper for its discharge; it may be imposed directly, or may arise out of a general duty imposed by law; it is certain, when it must be absolutely performed, and the officer has no discretion; and it is ministerial when an individual has such a legal interest in its performance that neglect becomes a wrong to him.

There is nothing in the Constitution of the State that prevents the Legislature from passing an Act delegating to a ministerial officer the duty of ascertaining the rate or per centage of taxation to be applied to the assessed value of the taxable property of the State—the data for making the computation being furnished by the Act.

The direction in the general tax Act that the State Auditor shall, on or before the 15th day of November, "annually give notice to each County Auditor of the rates or per centum authorized by law to be levied for the various State purposes," &c., delegates to the Comptroller General, upon whom the duties of the State Auditor have been devolved by law, the duty of fixing the rates or per centum of taxation in all cases where the Legislature has furnished the data for making the computation but has not fixed the rates or per centum.

Where *mandamus* is applied for as a civil remedy to compel the proper officer to levy the tax to pay the interest on a particular State bond, held by the relator, and mentioned in his petition, the remedy must be confined to that particular bond, and cannot be extended so as to include all other bonds of the same class and entitled to the same remedy if applied for.

The law having designated the 15th day of November as the day on or before which the annual notice to each County Auditor of the rates of taxation shall be given, if the officer charged by law with the duty has neglected to include in the notice the rate of a particular tax which should have been included, it is too late after the 15th day of November to apply for *mandamus* to compel him to give the notice.

Where an officer charged by law with the performance of a particular duty on or before a day fixed by law, gives notice before the day that he does not intend to perform the duty, *mandamus* lies to compel him.

These were five several petitions for *mandamus* by Morton, Bliss & Co., of the city of New York, relators against Solomon L. Hoge, Comptroller General of the State, respondent.

The pleadings in each case consisted, besides the petition, of the return of the respondent to a rule to show cause, and reply thereto of the relators, and a rejoinder of respondent.

The petitions were numbered from 1 to 5, inclusive, and the cases were heard together upon the pleadings, but for a full understanding of the questions decided, it is only necessary to give the petitions and return in the case, marked No. 1. Such differences as the other cases presented being fully shown by the opinion of the Court.

The allegations and prayer of petition, designated No. 1, are as follows :

1. That under and by virtue of the authority granted to the Governor of the State aforesaid, in and by the Act of the General Assembly of the said State, duly passed on the 26th day of August, A. D. 1868, and entitled "An Act to authorize a loan to redeem the obligations known as the Bills Receivable of the State of South Carolina," bonds of the said State were executed and issued conformably to the directions and provisions of the said Act; that the said bonds so issued amount, in the aggregate of their principal sums, to five hundred thousand dollars, as shown by the annual report of the State Treasurer, N. G. Parker, to the General Assembly, dated 31st of October, A. D. 1871, and that your petitioners are the holders and owners in good faith, and for valuable consideration paid, of one of those bonds which is dated 1st October, A. D. 1868; bears six per cent. interest, payable on the 1st of April and 1st of October in each year; is numbered 483; is for the principal sum of one thousand dollars, to be paid on the 1st day of April, A. D. 1888, and has been duly registered in the office of the Treasurer of the said State.

2. That in and by the first Section of the said Act, it is provided that the interest upon the bonds thereby authorized to be issued (being at the rate of six per cent. per annum) shall be payable semiannually; and in the sixth Section of the same Act it is further provided "that an annual tax, in addition to all other taxes, shall be levied upon the property of the State sufficient to pay the interest on the said bonds, when such interest shall fall due;" that in and by the first Section of the Act of the General Assembly of the said State, approved 13th March, 1872, and entitled "An Act relating to the Bonds of the State of South Carolina," it is enacted that the aforesaid bonds, issued on behalf of this State, as mentioned and set forth in the aforesaid report of the State Treasurer to the General Assembly, were duly and lawfully issued in conformity to the true intent and meaning of the said Act of 26th August, 1868; and that in and by the fourth Section of the said Act of 13th March, 1872, the aforesaid sixth Section of the Act of 26th August, 1868, is declared to be a part of the said Act of 13th March, 1872, and by the same Section of the aforesaid Act of 13th March, 1872, it is again enacted "that an annual tax, in addition to all other taxes, shall be levied upon the property of the State sufficient to pay the interest upon the aforesaid bonds," until the principal of the said bonds shall become due.

3. That by the law of the said State the Comptroller General is required, on or before the fifteenth day of November in each year, to give notice to each County Auditor of the rates per centum authorized by law to be levied as public taxes for the various State purposes, "which rates or per centum," it is enacted, shall be levied by the County Auditor on the taxable property of the County, and charged on the duplicate, with the taxes required to be levied and collected for other purposes."

4. That on the 13th March, 1872, J. L. Neagle was the Comptroller General of the State, and continued so to be until the 7th day of December in the same year; that during this period, and as such officer, the said J. L. Neagle was bound by law as aforesaid to give notice to the County Auditors, respectively, of the rate or per centum necessary to be levied in order to produce a sum sufficient to pay the interest which became due upon the said bonds during the year 1872, together with the interest on the same which would become due during the succeeding year, 1873, as provided for by the Acts of the General Assembly hereinabove mentioned; and that, nevertheless, no due or lawful notice to such effect was ever given to the County Auditors, respectively, of the said State by the said J. L. Neagle, while he was the Comptroller General as aforesaid.

5. That on the 7th day of December, A. D. 1872, Solomon L. Hoge became, and now is, the Comptroller General of the said State, and the successor in office of the said J. L. Neagle; that on the 1st day of April, 1873, other and additional sums became due and payable, for interest upon the aforesaid bonds, and those sums, with the interest that became due upon the said bonds on the 1st of October and 1st of April, 1872, still remain in arrear and wholly unpaid.

6. That very recently, and since the 1st day of April, 1873, your petitioners demanded of the said S. L. Hoge, Comptroller General, as aforesaid, that he should proceed forthwith to give to the County Auditors, respectively, of the said State, the requisite notice of the rate or per centum upon the taxable property of their respective Counties necessary to be levied in order to make payment, as well of the interest upon the aforesaid bonds already due as of the interest upon the same that will become due on the 1st October, 1873, so that the interest due and in arrear upon the bond held by your petitioners, as aforesaid, might be paid to them without delay out of

VOL. 4—28

that tax when collected, and that out of the same the interest upon the said bond falling due on the 1st October, 1873, might then also be paid to them, and that the said S. L. Hoge, Comptroller General, as aforesaid, declined and refused to give such notice.

7. That thereupon your petitioners demanded of the said S. L. Hoge, Comptroller General, as aforesaid, that he should give due notice on or before the fifteenth day of November, 1873, to the County Auditors, respectively, of the said State, of the rate or per centum necessary to be levied upon the taxable property within their respective Counties, in order to raise a sum sufficient to pay the interest already due and in arrear upon the said bonds, together with the interest upon the same that will become due on the 1st October, 1873, and the 1st April and 1st October, 1874, so that your petitioners might be paid out of that tax, when collected, the interest that should then be due upon the bond held by them as aforesaid, and be also paid the sums for interest upon the same payable on 1st April and 1st October in the year 1874, when the same respectively should become due, and that the said S. L. Hoge, Comptroller General, as aforesaid, likewise declined and refused to give such last mentioned notice.

8. And your petitioners further show that they have suffered wrong and injury, as aforesaid, by reason of the refusal of the said S. L. Hoge, Comptroller General, as aforesaid, of the State, to give due notice to the County Auditors, as aforesaid, of the rate or per centum to be levied upon the taxable property of the State for payment of the annual interest upon the said State bonds as provided for by the Acts of the General Assembly hereinabove mentioned, and that your petitioners are entirely without remedy in the premises, unless it be afforded by the writ of *mandamus;* and your petitioners therefore pray that a peremptory writ of *mandamus* may issue out of this Court against the said S. L. Hoge, Comptroller General, as aforesaid, commanding him forthwith to give to the County Auditors, respectively, of the said State, the requisite notice of the rate or per centum upon the taxable property of their respective Counties necessary to be levied, in order to make payment, as well of the interest upon the aforesaid bonds already due as of the interest upon the same that will become due on the 1st of October, 1873, so that the interest due and in arrear upon the bond held by your petitioners, as aforesaid, may be paid to them without delay out of that tax when collected, and that out of the same the inter-

est upon the said bond falling due on 1st October, 1873, may then also be paid to them; or else that a peremptory writ of *mandamus* may issue out of this Court against the said S. L. Hoge, Comptroller General, as aforesaid, commanding him to give due notice, on or before the 15th day of November, 1873, to the County Auditors, respectively, of the said State, of the rate or per centum necessary to be levied upon the taxable property within their respective Counties, in order to raise a sum sufficient to pay the interest already due and in arrear upon the said bonds, together with the interest upon the same that will become due on the 1st of October, 1873, and the 1st of April and 1st of October, in the year 1874, so that your petitioner, may be paid out of that tax, when collected, the interest that shall then be due upon the bond held by them, as aforesaid, and be also paid the sums for interest upon the same payable on 1st April and 1st October in the year 1874, when the same, respectively, shall become due, as provided for by the Acts of the General Assembly hereinabove mentioned; and that such .other order may be made in the premises as justice may require.

The petition was verified by one of the attorneys for relators, and was accompanied by an affidavit of Niles G. Parker, late State Treasurer, stating that the bond mentioned in the petition had been duly registered in the office of the State Treasurer of the State, and that no interest had been paid on the bonds issued under the Act of August 26, 1868, since December 31, 1871, and by an affidavit of Walter Watson, stating that he was a member of the firm of Morton, Bliss & Co., and that said firm were the owners and holders, *bona fide* and for value, of the bond mentioned in the petition.

The return of the respondent is as follows :

Solomon L. Hoge, Comptroller General of the said State, upon whom an order of said Court has been served, requiring him, on a day therein named, to show cause "why a writ of *mandamus* should not issue against him as prayed for in the petition," for cause shows :

*First.* That it is not the clearly prescribed ministerial duty of this respondent to give notice to' the County Auditors of the rate or per centum upon the taxable property in their respective Counties necessary to be levied to pay the interest due and to become due, upon the bonds referred to in the petition, because—

1. The authority to ascertain and determine the rate or per centum of taxation is delegated by the Constitution to the General

Assembly, and not to the Comptroller General or to any other State officer; whilst the duty of this respondent, in this regard, is solely to give notice annually, on or before November fifteenth, of the rate or per centum so by the General Assembly ascertained, determined and authorized.

2. Neither the rate or per centum necessary to pay the interest due and to become due upon the bonds referred to in the petition, nor the rates or per centum to be levied for the various State purposes on or before November fifteenth next, have been ascertained and authorized by the General Assembly, and this respondent is, therefore, without the authority requisite to the performance of his duty in the premises.

3. This respondent is informed, and so charges the fact to be, that a large number of the bonds, issued in pursuance of the Act referred to in the petition, have been returned to the State Treasury, and there redeemed by the substitution of other bonds of the State; so that the number of bonds outstanding is unknown to this respondent, and cannot be ascertained without inquiry and the exercise of discretion which do not pertain to the office or the duty of this respondent. And this respondent submits, that if the duty of ascertaining and determining the rate or per centum, as demanded by the petitioners, were devolved upon him by law, he would be without the *data* requisite to its performance.

4. That the notice of the rates or per centum authorized by law, for the current fiscal year, having been already given by this respondent, there is no authority for the notice of any other rates for or during the current fiscal year.

5. That if the rates or per centum for the fiscal year, to commence November 1, 1873, were ascertained and authorized by law, the petition for a *mandamus* to require this respondent to give notice thereof to the County Auditors before the 15th day of November next is premature, and, according to established practice, cannot be granted.

*Second.* For further cause this respondent shews—

1. That the proceeding by *mandamus* is founded upon the authority of the Court to order the final performance of the duty claimed; that the remedy herein prayed for would be delusive unless the Court has the authority to order the payment of the money when collected; that no money can be drawn from the Treasury " but in pursuance of appropriations made by law;"

that no appropriation has been made to pay the interest as claimed by the petitioners; and that, therefore, the judgment of this Court herein would be vain and nugatory.

2. That by the provisions of the Act of the General Assembly, approved March 23, 1872, referred to in paragraph 2 of the said petition, a registration of all the bonds and stocks, which constitute the public debt of the State, is authorized and directed to be made; and it is in terms declared that the State Treasurer and Financial Agent of the State, in the city of New York, shall not pay interest on the said bonds and stocks, until they have been registered according to the requirements of the said Act; that this respond-ent is not informed whether the bonds referred to in the petition have been, and he here charges that they have not been, so registered; and he submits that, until such registration be com-pleted, the judgment of this Court requiring the levy of a tax to pay interest thereon would be vain and nugatory.

*Third.* For further cause this respondent shews that the bonds, upon which payment of interest is sought by the petitioners, do not constitute valid obligations of the State for the reasons—

1. That by the Act of the General Assembly, ratified August 26, 1868, under which said bonds purport to have been issued, it was expressly provided that the bonds authorized by said Act should be "sold at the highest market price by the Financial Agent of the State, in the city of New York, and not less than for a sum to be fixed by the Governor, Attorney General and the Treasurer;" and this respondent is informed, and so charges the fact to be, that the said bonds were not sold in conformity with these requirements of the law.

2. That a large portion of the bonds so issued have been returned to the State Treasury upon the substitution in their stead of other bonds of the State; and this respondent is informed, and so charges the fact to be, that the bonds so returned, and thereby redeemed and paid, have been re-issued without warrant of law.

3. That the said Act is unconstitutional and void, in that it pur-ports to authorize the contracting of a public debt, and does not levy a tax annually sufficient to pay the annual interest of such debt.

*Fourth.* For further cause this respondent shews, that, according to the established practice in *mandamus*, the writ will not be allowed, ordering a levy to pay a debt, until such debt shall first have been

ascertained by the judgment of a Court, and the payment thereof refused; that in respect of a debt due by the State, no such judgment can be had without the consent of the State; and this respondent submits that this Court is, therefore, without jurisdiction by *mandamus* to enforce the same against the State, either directly or through its officers.

*Fifth.* For further cause, this respondent shews, that the bonds referred to in the petition, if valid obligations of the State, are part of the public debt of the State, the aggregate amount of which public debt, according to the Treasurer's report of October 31, 1871, referred to in the petition, is fifteen millions, eight hundred and fifty-one thousand, three hundred and twenty-seven dollars and thirty-five cents ($15,851,327 35-100,) upon all of which there is interest now past due and unpaid; and if it be the ministerial duty of this respondent to give notice to the County Auditors of a rate per centum to be levied to pay the interest upon the bonds referred to in the petition, this Court will not order the *mandamus* to issue as prayed for, without, at the same time, requiring that the rate per centum to be levied shall suffice to pay the interest upon the entire aggregate of the public debt.

*Sixth.* This respondent further shews and charges that, to the extent at least of $7,191,700, the aggregate, herein above referred to, is not the valid debt of the State, and that the bonds enumerated in said report, if outstanding, are to that extent outstanding without authority of law; and in view of this condition of the public debt, this Court, if it have jurisdiction to require this respondent to give notice of a rate per centum to be levied to pay the interest upon the public debt, should not order such writ to issue until an investigation shall first be had to ascertain what portion of the said aggregate of public debt subsists as the valid debt of the State.

*Seventh.* This respondent further shews that, by the provisions of the Act of March 13, 1872, referred to in said petition, the General Assembly, having in view the condition of the public debt, and to the end that the true amount thereof might be definitely ascertained, has authorized and directed a registration of all outstanding bonds and stocks to be made by certain appointed agencies, which registration, as this respondent is informed and so charges, is yet incomplete. This respondent submits, therefore, that if the Court has jurisdiction under proceedings in *mandamus* to direct an inquiry as to the true amount of the valid public debt, it should not assume

so to do pending the registration thus directed by the General Assembly, and now being prosecuted by its own appointed agencies.

*Eighth.* For further cause, this respondent submits, that by the Constitution of this State, the power to contract a public debt, and to provide for the mode and manner of its payment, is delegated exclusively to the General Assembly; that the time at which, and the mode in which provision shall be made for its payment, involve questions and considerations of public policy which can only be determined in law and of right by the General Assembly; that any interference therewith by the judicial department of the government is expressly prohibited by the Constitution; and this Court is without authority, directly or indirectly, to take jurisdiction of the matter.

*Ninth.* And this respondent respectfully submits to this honorable Court that the writ of *mandamus*, as prayed for by the petitioners, would be, for the causes hereinbefore shewn, in direct contravention of sound public policy, justice and good government.

The return was duly verified by the respondent.

*Chamberlain, Carroll & Janney,* for relators.

*Melton,* Attorney General, and *C. D. Melton,* for respondent.

For the relators, the several Acts of the General Assembly and Sections and Articles of the Constitution of the State, referred to in the opinion of the Court, were cited, and also the following authorities :

Moses on *Mandamus,* 16, 15, 18, 213 ; Tap. on *Mandamus,* 62–3, 348, 352, 359 ; *Kentucky* vs. *Dennison,* 24 How., 66 ; Step. N. P., 2291; *The Prop. St. Luke's Ch.* vs. *Stock,* 7 Cush., 226 ; *People* vs. *Allen,* 6 Ward., 487 ; *Torry* vs. *Millbury,* 21 Pick., 67 ; Cooley on Const. Lim., 74, 78, 90, 87, 371, 381, 141; *People* vs. *Draper,* 15 N. Y., 543 ; *Fletcher* vs. *Peck,* 6 Cranch, 137 ; *Dartmouth College* vs. *Woodward,* 4 Wheat., 643 ; *Jefferson Branch Bank* vs. *S. Kelly,* 1 Black., 436, 448 ; *Mathis* vs. *McGee,* 4 Wal., 153 ; *New Jersey* vs. *Wilson,* 7 Cranch, 164 ; *Gordon* vs. *Appeal Tax Court,* 3 How., 133 ; *Ohio Life & Trust Co.* vs. *DeBolt,* 16 How., 416 ; *Dodge* vs. *Woolsey,* 18 How., 331 ; *McGee* vs. *Mathis,* 4 Wal., 143 ; *Home of Friendless* vs. *Rouse,* 8 Wal., 430 ; *Reid* vs. *Railway,* 13 Wal., 269 ; *The Commissioners of Knox County* vs. *Aspinwall,* 24 How., 376 ;

*Van Hoff* vs. *City of Quincy*, 4 Wal., 535; *City of Galena* vs. *Amy*, 5 Wal., 705; *Riggs* vs. *Johnson County*, 6 Wal., 166; *Green* vs. *Biddle*, 8 Wheat., 84; *Woodruff* vs. *Trapnall*, 18 How., 202; *Furman* vs. *Nichol*, 8 Wal., 44; *Curran* vs. *Arkansas*, 15 How., 304; *Hawthorn* vs. *Calif*, 2 Wal., 10; *Antoni* vs. *Wright*, Court of Appeals of Virginia, 1872, Law Times, Dec., 1872, p. 472; *Gosher* vs. *Stonington*, 28 Conn., 97; *Bronson* vs. *La Crosse*, 2 Wal., 283; *Wood* vs. *Lawrence*, 1 Black, 386; *Alexander* vs. *Springfield*, 2 Metc., 534; *Nelson* vs. *Cowing*, 6 Hill, N. Y., 339; *The Royal Bank* vs. *Turquand*, 6 Ellis and B., 327; *Gelpeke* vs. *Dubuque*, 1 Wal., 175; *Supervisors* vs. *Schenck*, 5 Wal., 772; *Bissel* vs. *Jefferson-ville*, 24 How., 299; *Mayor*, vs. *Lord*, 9 Wal., 409; *City of Lexing-ton* vs. *Butler*, 14 Wal., 282; Bright., Fed. Dig., 814, Tit. Statute; Barday's Dig. Rules of Congress, 214; *Walker* vs. *Caldwell*, 5 La. An., 268; *People* vs. *Mahoney*, 13 Mich., 494; *Mutual Ins. Co.* vs. *Mayor of New York*, 8 N. Y., 253; *State* vs. *County Judge of Davis Co.*, 2 Iowa, 282; *Conner* vs. *Mayor of New York*, 5 N. Y., 293; *Davis* vs. *Wadsrough*, 9 Iowa, 104; *Sharp* vs. *Mayor of New York*, 31 Barb., 572; *O'Leary* vs. *Cook Co.*, 28 Ill., 534; *Mozier* vs. *Hilton*, 15 Barb., 657; *People* vs. *Cann*, 16 N. Y., 58; *Bath Co.* vs. *Amy*, 13 Wal., 244; *Hayne* vs. *Hood*, 1 S. C., 16; *Commonwealth* vs. *Alleghany*, 32 Penn., 223; *Commonwealth* vs. *Pitts-burg*, 34 Penn., 512; *Commonwealth* vs. *Commissioners*, 37 Penn., 246; *Ohio* vs. *Clinton Co.*, 6 Ohio R., 280; *Gergas* vs. *Black-burn*, 14 O. R., 252; *Sayer* vs. *Minns*, Cowp., 57.

The following are the authorities cited by respondents' counsel:

Tapp. on *Mandamus*, 78–9, 15, 16, 69; Story on Const., 369; Black. on Tax Titles, 1, 665, 26, 155; *Attorney General* vs. *New-bern*, 1 Dev. and Bat. Eq., 217 : 2 Cranch, 390; Cooley on Const. Lim., 116, 517, 141, 479; 11 Johns., 80; 4 Pet., 563; Moses on *Mandamus*, 84, 18; *People* vs. *Lawrence*, 2 Hand, 141; *Kendal* vs. *United States*, 12 Pet., 524; *Decatur* vs. *Paulding*, 14 Pet., 515; *Brashear* vs. *Mason*, 6 How., 102; *United States* vs. *Guthrie*, 17 How., 304; *United States* vs. *Seaman*, 17 How., 230; *United States* vs. *The Commissioner of the General Land Office*, 5 Wal., 565; *Reeside* vs. *Walker*, 11 How., 291; *People* vs. *Tremain*, 29 Barb., 96; *Ex Parte Fleming*, 4 Hill, 581; *United States* vs. *Fisher*, 2 Cranch, 390.

Aug. 27, 1873. The opinion of the Court was delivered by

WILLARD, A. J. The relators have filed five petitions, setting forth in each petition that they are the owners and holders of a bond of a certain specified class, issued by the State, on which interest is due and unpaid, and demanding that a writ of *mandamus* issue to compel the respondent, as Comptroller General of the State, to issue directions to the respective County Auditors to levy a tax, in addition to all other taxes imposed by law, for the payment of the interest due and to become due on such bonds.

The five bonds set up in the five petitions are, each, for the sum of $1,000, and are of the following classes: That in petition No. 1, issued under an Act entitled "An Act to authorize a loan to redeem the obligations known as the Bills Receivable of the State of South Carolina," passed August 26, 1868, (14 Stat., 17;) that in petition No. 2, issued under an Act entitled "An Act to authorize a State loan to pay interest on the public debt," passed August 26, 1868, (14 Stat., 18;) that in petition No. 3, issued under an Act entitled "An Act to authorize a loan for the relief of the Treasury," passed February 17, 1869, (14 Stat., 182;) that in petition No. 4, issued under an Act entitled "An Act to provide for the appointment of a Land Commissioner, and to define his powers and duties," passed March 27, 1869, (14 Stat., 275;) and that in petition No. 5, issued under an Act entitled "An Act to amend an Act entitled 'An Act to provide for the appointment of a Land Commissioner, and to define his powers and duties,' and for other purposes," passed March 1, 1870, (14 Stat., 385.)

The ground upon which the relators place their demand for the relief sought is, that, by the Constitution of this State and the several statutes passed in pursuance thereof, under which the bonds in suit were issued, it is made the absolute duty of the respondent to take such steps as are authorized by the statutes fixing the powers and duties of his office, in order to cause a tax to be levied on the taxable property of the State, sufficient in amount to pay the interest upon the bonds of the relators of the five specified classes.

The various questions presented for discussion and adjudication appear, distinctly, in the various objections to the issuing of the writ interposed by the respondents' return, and can be advantageously and fully discussed in the form presented by the respondent.

The first class of objections that will be noticed as going to the

foundation of the relators' right involves the constitutionality of the five enumerated Acts on several grounds, some of which affect all five Acts, and others one or more of such Acts.

The first objection will be found stated in petition No. 4, with reference to the Act set forth in that petition, and is as follows: " That the said Act is unconstitutional and void, in that it relates to more than one subject, and that so much thereof as purports to authorize the contracting of a public debt is not expressed in its title."

The clause of the Constitution, which is the ground of this objection, is in Section 20 of Article II, and reads as follows: " Every Act or resolution having the force of law shall relate to but one subject, and that shall be expressed in the title."

In considering whether the Act, to which the objection relates contravenes this provision of the Constitution, it becomes necessary to inquire what is a " subject," in the sense of the Constitution, and what is the force of the word " expressed."

In the most general sense, the subject of a statute is some right, obligation or power, either public or private, created, modified or destroyed, for the purpose of attaining some end, either of public or private advantage, which constitutes the object of the statute.

Where the rights, obligations or powers, which are the subject of the statute, appertain to a public function of the government, to be exercised through or by means of a public office, such office, by its established title, or the public officer who holds it, by his name of office, is, according to Parliamentary usage and common understanding, the immediate and direct subject of the statute.

If the statute intends merely a modification of some particular power or duty appertaining to an existing office, the office is still, in a reasonable sense, the proper subject of the statute; but if, as in the present case, the object of the statute is to create or bring into existence an office not theretofore existing, such office is, in the strictest sense, the proper subject of the statute.

In a statute creating a public office, whatever is regarded by the Legislature as requisite to describe or establish the nature of the office, the character, limit and effect of the powers communicated, the nature and extent of the duties intended to be imposed on its incumbent, and the official and personal rights intended to be claimed and exercised by such incumbent, as well as all provisions intended to afford means of carrying out the objects contemplated

by the establishment of such office, may be regarded as part of the subject-matter and entering into the proper subject of the statute.

The Act in question purports, by its title, to deal with the Land Commissioner and his office. Do the provisions of the Act authorizing the creation of a public debt, for the purposes and uses of the Land Office, properly appertain to the subject of the Act?

There is nothing contained. in the Constitution bearing on the requisites of an Act authorizing the creation of public debt, or fixing the mode of procedure in such cases, which can have the effect of rendering it necessary that authority for such purpose should be communicated by an Act relating exclusively to the proceedings for the creation of such debt, nor rendering it improper that provisions for the creation of such debt should be incorporated with some other subject to which they properly appertain, and that it should be treated of under such general subject.

The Section of the Constitution that affects the question of the requisites of a statute valid for the creation of public debt is Section 7, Article IX, hereinafter cited at length. Section 7 requires that the object of creating a debt shall be stated in the Act. The object referred to is the thing intended to be procured or done by means of the money to be raised by borrowing. It allows only a single object of expenditure to be provided for in any Act authorizing the creation of public debt. If the Act attempts to confer authority to borrow money in reference to two or more disconnected objects of expenditure, it is not in conformity to the Constitution. The object must be distinctly specified in the Act. It is also required that, to become effectual, it must pass by a vote of "two-thirds of the members of each branch of the General Assembly." The vote on its passage is required to be recorded by yeas and nays on the journals of each House respectively. It is also required that every such law shall levy a tax annually sufficient to pay the interest of such debt. Finally, the object of expenditure must be "extraordinary." Does compliance with these requirements of Section 7 render it necessary that an Act authorizing the creation of public debt should treat the conferring of such authority as the proper and exclusive subject of such Act, and that such subject should specifically appear and be expressed in the title? It is obvious that such is not the intent or effect of Section 7. As it regards the mode of passing the Act, nothing need be said in this connection, for a regulation as to the forms of authentication cannot, in itself, operate to determine what

the Act shall, and what it shall not contain, and how its contents shall be stated. Whatever it may contain, in order to take effect under the Constitution, as authority for creating public debt, it must pass in the required manner.

So the clause requiring that such Act shall levy a tax to pay interest, while it determines its necessary character as to one particular, yet it cannot operate to determine to any extent what or how many other distinct matters, not inconsistent with that feature, shall be contained in the Act.

It remains, then, only to consider whether that which the Constitution requires in regard to the character and mode of stating the object of expenditure controls the Act, as it regards the exclusion of matters other than what is necessary for a mere statement of a single object, and the provisions for borrowing money with reference to such object.

It is required that the object shall be stated. Assuming that it is a sufficient statement to satisfy this requirement that the object of expenditure shall be merely named so that it can be recognized and distinguished from all other objects of expenditure, there is nothing in the language or meaning to prevent the Legislature from going beyond such mere mention of the object by its name, and fixing, by definite legal enactment in the same Act, the precise intention as it regards such object of expenditure, and covering all the demands that may be made for legislative direction in the course of carrying such object into practical realization.

This may be illustrated by supposing that the object of expenditure was the erection of a public building. There are two provisions to be made by the Legislature. In the first place, authority is to be conferred upon some officer to construct the building, and in the next place, means are to be provided for the construction. If these means are to be obtained by borrowing on the public credit, other provision is to be made by a law conformable with the Constitution for obtaining money by borrowing. The question under immediate consideration is, whether there is anything in the Constitution that would prevent all these measures requisite to the attainment of a single object from being incorporated together in one legislative Act.

Now, the object of expenditure in the case supposed, is the erection of a public building. It appears to be an extraordinary expenditure—that is to say, it forms no part of the regularly

recurring current expenses of the government. The authority to borrow money must be confined to this specific object, and no other object, such as the building of a canal or other distinct public improvement, can be associated with it, as participating in the fund to be created by borrowing. This object must be distinctly stated as the object of expenditure contemplated, as it regards the money borrowed. Now, when the Legislature have put all these matters in the Bill, in conformity to the Constitution, can they go on and describe the building intended to be erected, fix its location and the materials out of which it shall be constructed, limit its cost, and supply all other needful legislation, so that the work may be completed without further appeal to the Legislature for direction? If the provisions of the Constitution forbid this, it must be because it was within its intention, in saying that a single object of a certain class should be distinctly specified, to declare that no other legislative directions as to the nature of the object or the mode or means of its accomplishment shall be included, beyond the mere naming of such object of expenditure. It is not the province of a Court to search out such hidden and unexpressed intentions. The thought of the framer of the Constitution must be fixed in the terms employed, as read, in view of the objects he is seeking to attain. Before the Court could find any such intent, by any implication, it would be necessary to find some real and obvious incongruity in the associating together in one Act of various provisions, having for their end the definition of the object of expenditure and the means of its attainment. There is no such incongruity. It is the most natural and proper thing, in providing for the construction of a public work, in all its details, to go on and complete the arrangements for the construction of such work, by indicating the sources from which the means of its accomplishment are to come, and directing the steps by which the means can be placed in hand, applicable to the prosecution of the work. All these matters are properly parts of one general subject, that may be treated together or divided up and considered in separate acts, as that body finds either course most convenient.

Looking, then, to the Act in question, we see that its subject is the powers and duties of the Land Commissioner; that as it is necessary to have means to carry out the object of creating that office, so it was proper in the Act providing for the creation of such office to provide such means; that as the expenditure required was

clearly extraordinary, borrowing on the credit of the State for that purpose was attainable under the Constitution; and, therefore, it was proper that provision should be made covering the acquisition of such means by borrowing.

As it appears that, properly considered, the Act in question has only one subject, the remaining inquiry is whether that subject is, in the language of the Constitution, "expressed in the title." Expression in its legal sense is used in opposition to implication. It is not sufficient, then, that the title is such that the subject of the statute can be made out from it by implication; it must be actually named or expressed in it. That has been done in the Act in question. The proper subject of the Act is in the Land Commissioner, his powers and duties, and that subject is fully expressed in its title.

The objection just considered is also taken in reference to the Act in Petition No. 5, but as that Act is amendatory to the Act in reference to which the objection just considered was applied, and as the title of the last named Act was repeated, in express terms, in the title of the amendatory Act, as the subject of its amendment, what has already been said in regard to the Act in Petition No. 4 applies with equal force to that in Petition No. 5.

The next objection is raised as affecting the validity of all the five Acts, and is as follows: " That the said Act is unconstitutional and void, in that it purports to authorize the contracting of a public debt, and does not levy a tax annually sufficient to pay the annual interest of such debt." The clause of the Constitution in question is in Section 7, Article IX, which Section is as follows: "For the purpose of defraying extraordinary expenditures, the State may contract public debts; but such debts shall be authorized for some single object, to be distinctly specified therein, and no such law shall take effect until it shall have been passed by the vote of two-thirds of the members of each branch of the General Assembly, to be recorded by yeas and nays in the journals of each House respectively; and every such law shall levy a tax annually sufficient to pay the annual interest of such debt."

The language of the Act in Petition No. 1, to which this objection is applied, is as follows: " That an annual tax, in addition to all other taxes, shall be levied upon the property of the State sufficient to pay the interest on the loan hereinbefore authorized at the times when such interest shall fall due." The language used in the other four Acts is either the same as that quoted, or not substantially differing from it.

The proposition of respondent is, that the introduction of the clause in question is not a sufficient compliance with the last clause of Section 7, Article IX, requiring the levy of a tax to pay interest, and on this ground he alleges the unconstitutionality of the five several Acts.

The first matter to be considered is the object and intent of the clause of the Constitution in question, which reads that "every such law shall levy a tax annually sufficient to pay the annual interest of such debt." The direct object of this clause was to secure so full an exercise of the legislative power at the moment of communicating authority for creating public debt that it should not again become necessary to appeal to that body in order to secure means or authority for the payment of annual interest on the sums so borrowed. Under this clause there cannot be a full exercise of the legislative power to contract public debts, unless that legislative Act amounts to an exhaustive exercise of the power of providing means for the payment of annual interest.

The Constitution intended to place the proceedings by which means are to be acquired for the purpose of paying interest on the public debt beyond the control of the Legislature. The object of this was, obviously, to reduce the question of the payment of interest on any public debt created under the Constitution to a mere executive duty, that might be compelled through a remedy under the control of the bondholder.

In considering the correctness of the position just assumed, the proposition presents itself that this provision of the Constitution was intended, mutually, for the benefit of the State and its bondholder. In framing enactments with a view to the borrowing of money, whether those enactments are intended to form part of the fundamental law or of ordinary legislation, the leading objects are, first, to facilitate such borrowing, and, second, to prevent abuses of such power. The idea of facilitating the act of borrowing involves the offering of inducements to the lenders of money to loan the required amount on favorable terms and the creation of an agency of the government competent to offer and accept propositions in the name of the government and of carrying into practical operation such terms as may be agreed upon within the authority of the public agent. A loan of money to a State, unless belonging to the class of forced loans, not involved in the present case, is a voluntary act of the lender, that proceeds upon offers or inducements pre-

sented by the borrower or his accredited agent, and accepted or rejected, according to the view the lender may take of his interest in the matter. Such a transaction is preceded by negotiation, which is the presentation of the offers of the borrower to the mind of the lender in the form most attractive—that is, most in accord with his views of his own interest in the matter. The object of negotiation is not simply to induce him to lend, but to lend on the most favorable terms. The ideas that are uppermost in the mind of the lender are, first, what his money is worth in the way of interest, assuming that it is certain to be repaid, and, second, if the risk of repayment is not too great to permit him to make the transaction, what is the equivalent, in the way of an increased rate of compensation, for the risk that he must assume in this respect. In other words, the lender is seeking profit on his money and security. These incidents must be regarded as present in every transaction of that class, and form the basis of the legal conception of the relation existing between borrower and lender. Whatever there is within the propositions made by the borrower looking to an increase of security on the part of the lender must be regarded as part of the inducement, and, if capable of doing so, as entering into the very essence of the contract.

When a sovereign State enters into a contract of borrowing with an individual, it assumes to be bound, in all particulars, as an individual under like circumstances would be bound, by what is expressed or properly implied by the terms of such contract. The measure of its obligation is that applied to individuals. It is only in the consequences that flow from a breach of the contract that there is a difference between the case of a State and an individual. The individual can be sued ; the State cannot. The reason of the difference is that a suit presupposes the submission of a controversy between two or more to a third party, independent of both, and, therefore, capable of dealing with the question in a judicial spirit and with judicial authority. When a sovereign State violates its contract, no such independent source of authority can be appealed to, for the fact of sovereignty in the State precludes the possibility of its existence. The idea that a State cannot be sued for a breach of its contract then means, simply, that there is no power that can be invoked, within the means and appliances afforded by civil government, by which it can be compelled, against its will, to do that which in right and justice ought to be done in the case. A State

that should deny the existence of its obligation, as resulting from its contract voluntarily made, on the ground that no means of compulsion existed to oblige a performance of its duties, would at once espouse the principles and enter upon the practices of the confirmed criminal classes of society, with whom obligation means nothing more than the pains and penalties that may flow from its denial or disregard. For the same reason, the State is bound, as it regards all the incidents properly appertaining to such a contract. The obligations thus assumed by a State have the force and effect of law, while, as it regards the States comprising the American Union, the fundamental law of the nation enters into such a contract, as well as into every contract made by a citizen, becoming an efficient part of it, through the operation of that provision of the Constitution that prohibits the passage of laws impairing the obligation of a contract. Should the State so far forget its exalted duties as to undertake to exercise its law-making power by way of denying or destroying its solemn contract, the life and spirit of the nation, flowing through its fundamental law and entering such contract, would lift it above the power of the State to obliterate or impair the record of its obligation.

When the law-making power makes a contract with an individual, the legislation conferring authority upon its agent and limiting his powers is to be considered as part of the contract, of which one dealing with the State is bound to take notice. If the agent of the State transcends his legal authority, or fails to conform to it, the person dealing with the State, through such agent, with knowledge of the action of the agent, gains no right against the State through such action. This shows that, to all intents and purposes, the legislation conferring authority upon the agent and prescribing the mode and manner of its exercise, as well as the limits of his authority, becomes part and parcel of the contract. It being thus seen that when the authority under which a contract of borrowing is made proceeds wholly from the Legislature, the Act and proceedings of that body in reference to it enter into and become part of such contract, it follows that where the powers of the Legislature are limited and controlled by a written Constitution, so as to become a test of the validity of the contract, the same principle just applied, as between the Legislature and its executive agent, must be applied as between the Constitution and the Legislature. If the provisions of the Constitution can become, under any circum-

stances, a test of the validity of the contract, then it follows that such provisions enter into the contract and become part of it.

It would follow that whatever is contained in the Constitution which shall be construed as bearing on the amount or kind of security that the lender to the State should hold and enjoy must be regarded as part of the inducements presented to his mind in the course of the negotiations that led him to form the contract with the State, and as part and parcel of that contract.

We come now to consider more carefully the exact bearing of the clauses of the Constitution under consideration, under the view just presented. The inquiry is, whether the provision as to the payment of annual interest was intended to facilitate the borrowing of money, by presenting to the mind of the lender an inducement, in the form of complete legislation, providing for the annual imposition and collection of a tax devoted by the Constitution to that express object, which, as affording a higher degree of security, as it regards the payment of interest, would tend to make the terms of borrowing more favorable to the State. If we thus conclude, it will follow that, as has been already stated, one of the objects, and a leading object, of the adoption of that clause was to secure advantages mutual to the State and the lender, the State getting its money on better terms and the lender being compensated therefor by obtaining more perfect security.

It is a historical fact that we are bound to notice that in 1868, the time when the Constitution was made, the position of the State, as it regarded financial credit, was unfavorable. It had just emerged from a war that had wasted, to a great extent, the property of the State in public and private hands, and had deranged, to a serious extent, the industries and occupations of the people. A considerable public debt existed, with no adequate means to meet demands for accruing interest. For the three preceding years the government of the State had been in a disorganized and anomalous condition. The people were just preparing for the institution of regular government. It was obvious that circumstances might arise calling imperiously for the exercise of the borrowing power, and it was the dictate of prudence to place that power in a condition for efficient exercise in the event of such a contingency, and, so far as the introduction of wise provisions in the Constitution would accomplish it, to remove as far as possible the disadvantages that surrounded any effort of the State to make a favorable impression on the minds of

those upon whom it must rely for pecuniary aid in such exigency as to its ability and fixed intention to meet its obligations. This was the occasion that accompanied and influenced the framing of the Constitution, and points the motive that is the key to its interpretation.

The difficulties that, under the most favorable circumstances, surrounded the attempts of the States of this Union to make available their financial credit in domestic and foreign markets, and only overcome after a long practice of public probity and prudence, was increased by the exceptional financial and political situation of the State. To remove at once, though only to a limited extent, the causes that acted unfavorably in all efforts of the States to make available their financial credit, was a necessity, in a condition of affairs so exceptional and embarrassing, and the highest dictate of prudence. The States of our Union, in addition to immunity from civil prosecution, enjoyed, in common with all other States, exercising sovereign or law-making power, were free from the apprehension of being compelled to discharge their duties by an act of war on the part of any aggrieved State or nation. They could neither be compelled to fulfill their obligations by civil remedies or by war. Such immunities carried with them their disadvantages. The financial credit was to that extent diminished. Their claim upon the money lender was his opinion of the force of the principle or the sentiment of honor that actuated the sovereign borrower—the degree of enlightenment that actuated its legislation from the standpoint and stimulus of self-interest, and the strength of his faith in governments regarded as established institutions with natural tendencies to conservative action. The lender lacked an element essential to reduce his idea of the risk attending a transaction with a State so circumstanced to the lowest possible point, namely, the power to enforce its obligation lodged in his own hand.

Under these circumstances, there was presented to the framers of the Constitution but one practicable course to overcome the difficulties in the way of obtaining money by borrowing, and that was to place in the hands of the lender a remedy of some kind or extent that would enable him to pursue the satisfaction of his demand in whole or in part. To bring into existence such a remedy, as independent of and opposed, possibly, to the law-making power of the government, was placing in the hands of the subject of law power to coerce the law-making authority. Such a course the Constitution

did not adopt. On the other hand, it was practicable to place in the hands of the lender a complete and perfect remedy, without bringing about the anomaly of a State compelled by its subject. This could be accomplished by attaching to the authority of the Legislature to contract public debts a condition covering the required remedy, without compliance with which condition the debt could not be brought into valid legal existence. This condition must be, that in the Act itself authorizing the creation of the debt there must be a complete performance on the part of the Legislature of everything necessary to be done, in order to make the steps requisite for requiring the means of paying the public creditor and applying these means to the discharge of his demand a mere ministerial act that could be compelled by a judicial remedy at all times within the power of the creditor. Such a remedy would not seek to enforce the obligations of a State, by compulsion applied to the State, and bearing equally upon its legislative and executive functions, but it would seek merely to compel an executive officer to perform that which was already commanded by the law-making power, and which was, in itself, law that the ministerial officer was bound to obey and the Courts had the right to enforce. Such a scheme would favorably impress the money lender, as he already knew that if such legislation was consummated, and if, on the faith of it, he had made with the State a contract by a loan of his money, that the Constitution of the United States, as well as of the State, would perpetuate the legislative features of such contract by destroying all subsequent legislation tending to impair their force or effect.

It was possible for the framers of the Constitution to carry out such a design to the extent of reducing the whole future action of the State government to a mere ministerial act of its officer or agent, both as it regarded the principal and interest of his debt. If they had seen fit, they could have required that, in every Act authorizing the creation of a public debt, provision should be made for an annual tax sufficient in amount to extinguish the annual interest on the amount borrowed, and also to pay a per centum of the principal of that debt. They could have appropriated such moneys as realized—that intended for the payment of interest to that direct purpose, and that intended to sink the principal into the hands of trustees, who would be amenable to the Courts for the honest discharge of their duties—and thus provision could be made by which the creditor of the State would hold in his hands a com-

plete remedy, and yet the sovereign dignity of the State would not be compromised. The State would exhibit its good faith by at once giving to its agents all the instructions requisite to enable them to meet the payment of its obligations at maturity, which instructions, under the operation of one of the greatest and most conservative features of our Constitutions, State and National, would become fixed and unalterable law.

The framers of the Constitution were not prepared to go to the length of making full provision by irrepealable legislation covering the payment of principal as well as interest. They deemed it prudent to limit such provision to the case of payment of interest. Though carrying the principle of placing the demand of the bondholder on the highest possible ground consistent with the nature of a State endowed with sovereignty no further than was necessary to give such high security as to the payment of interest, yet they evince a determination to place the payment of interest on the highest ground of constitutional certainty.

We will next consider, more immediately, the requirements of the clause under consideration, and which is in the following language: "And every such law shall levy a tax annually sufficient to pay the annual interest of such debt," having in view the line of inquiry on which we are proceeding, namely, whether this clause was intended to operate mutually for the benefit of the State and its creditor, parting with his money on its faith and credit, or exclusively for the benefit of the State. In other words, whether it was intended that this clause should afford some kind of remedy to the bondholder as it regards the interest accruing on his bond.

The motive of the clause will be better understood after an exact understanding of its purport, and if its intended effect is attained, what, then, is the exact end sought by the Constitution in this clause?

The immediate end is the levying of a tax of a particular character. The object of that tax, as disclosed, is to provide means to pay the interest annually accruing on certain bonds. The duty enjoined on the Legislature is to "levy a tax." A tax is the means by which a burden primarily borne by the State is transferred to the citizen. The obligation may have relation to debt already incurred, or it may be in anticipation, dependent on future contingencies. Three things are essential to a tax, as that term is under-

stood by our Constitution. First, the ascertainment of a sum certain, or that can be rendered certain, to be imposed on the collective body of tax payers; second, a legal imposition of that sum as an obligation on the collective body of tax payers; third, an apportionment of such sum among individual tax payers, so as to ascertain the part or share that each should bear. The precise nature of each of these acts depends to a large extent on the standing tax laws, as established by the Constitution and the Legislature. Their general character is, however, fixed in the nature of regular government, and modifications merely result under the peculiar mode of employing them adopted in the tax laws of different States or countries.

The first two acts above described, namely, the ascertainment of a sum to be imposed on the collective body of tax payers, and its imposition by a legislative declaration to that effect, are essentially legislative acts, or acts proper, directly, to the law making function of the government. These matters are not usually, if they are ever, left to the executive authority for its decision, nor could they be so left without endangering the balance of power between the parts of the government, which rests on natural principles. The Legislature should at all times retain in its own hands whatever tends to affect the limit of public obligations and expenditure. In addition to this, every State has more or less public property and sources of revenue independent of taxation, and the Legislature is the proper authority to determine to what extent public property and revenue should be applied to meet the pecuniary wants of the State, and how far the collective body of tax payers should be called upon to contribute to such end.

The third act, namely, the apportionment of the whole sum imposed by way of tax on the collective body of tax payers upon the separate individuals composing that body, is usually an administrative act, performed under specific statutory directions, ascertaining the mode and time of its performance. When the system is that of taxation based on property according to value, this act consists in ascertaining the persons holding property subject to taxation, the kind, amount and value of the property so held, and by a simple act of division, as applied to the whole sum to be raised, based on the ratio that the value of the property of the individual tax payer bears to the aggregate value of property held by the collective body of tax payers, to arrive at the share or portion of each such indi-

vidual tax payer. In practice, the amount to be raised is divided by the aggregate value of taxable property, and the quotient is a sum, which, multiplied by the value of the property of an individual tax payer, gives the amount which he should pay. When the aggregate value of property is ascertained at the time the tax levy is ordered, the Legislature frequently makes the division, and directs the levy to be made according to the resulting rate, which is thus established by law, instead of merely fixing the amount to be levied and leaving the rate to be ascertained by computation, after the aggregate valuation of property, subject to taxation, is ascertained and known. Both modes are resorted to, and both are equally appropriate to adoption by the legislative body.

As there are two distinct stages in this process, the result of one of which is to fix an indebtedness on the collective body of taxpayers, and the other on the individual tax-payer, so the word "levy" is indifferently employed, as commonly used, to express either one of these processes separately, or both collectively. A tax is said to be levied when the amount or rate to be imposed is fixed by law, for what is wanting to complete such levy is supplied by the standing tax laws, and consists in a course of administrative action. When the levying of a tax is spoken of as a legislative act, it is commonly understood to describe such action on the part of the Legislature as would, with the standing tax laws, complete the legislative authority requisite to enable the administrative department to distribute and collect the tax.

The Constitution, in the clause under consideration, in imposing a duty on the Legislature, as the condition of its resorting to borrowing money, intended to give a certain form to Legislative proceedings in such cases. The word "levy" must then be taken in the sense proper, when used to describe that part of the process of imposing taxes proper to be performed by the legislative body itself. To the extent that it enjoins action on the Legislature, it must be regarded as enjoining complete action. In other words, the tax directed to be levied must be so far imposed, in order to comply with the letter and spirit of the Constitution, that no further legislation will be necessary to enable its collection. This is obvious; for if the imposition of such tax was of so much moment as to be a proper subject for consideration and provision in the Constitution itself, then, clearly, a perfect and complete act is the least that can satisfy the requirements of the Constitution. In a word,

the Legislature must, at once, and before money is borrowed, exhaust its legislative functions, so far as it regards making provision by taxation for the payment of the interest on any loan to be made.

The object of the tax is declared to be the payment of annual interest. If this requirement stood alone and unqualified, it could, perhaps, be complied with in two ways : first, by directing a tax to be enforced annually, sufficient for the payment of the sum annually accruing as interest; or, second, it could direct a gross sum to be raised at once, to be held as a fund to sink interest as it should arise year by year. The first named of these methods is the one rendered appropriate by a proper construction of the words " annually sufficient." These words make it certain that the tax must be annually recurring, and fix the extent to which it shall be imposed, namely, to the amount of interest accruing. It is no objection to this view, that at the time the law authorizing the borrowing of money is passed, the extent to which money may be borrowed under it is not capable of being ascertained, because it depends upon the future will of the lender of money, as well as upon the will of the Legislature. As has already been said, the action of the Legislature in authorizing the collection of a tax is not complete and consummate until the amount to be raised is either fixed or made capable of ascertainment. The process of issuing or creating the debt, as inferred by the Constitution, is such that the amount of interest, annually accruing, is ascertainable by a mere computation based on facts, evidenced in a manner provided for in the Constitution itself. These provisions are set forth in Section 14, Article IX, in the following language : " Any debt contracted by the State shall be by loan or State bonds, of amounts not less than fifty dollars each, on interest, payable within twenty years after the final passage of the law authorizing such debt. A correct registry of all such bonds shall be kept by the Treasurer, in numerical order, so as always to exhibit the number and amount unpaid and to whom severally made payable." This Section determines both the evidence that shall entitle the public creditor, and that which shall guide the executive officers in all duties appertaining to such indebtedness. The creditor must hold a bond of a certain character and number, and the executive officer must test the validity of such evidence of debt by the official registry, required by the Constitution. Now, if these requirements of the Constitution are complied with in any

case, it is evident that the amount of interest to be annually paid is ascertainable by a mere computation, applied to evidences established by the Constitution for that purpose. In order to test the intent and meaning of the Constitution, which we are now attempt-- ing, we must not inquire, in any given case, whether such issue and registry has been made, but we must inquire what was contemplated, on the assumption that all things were properly carried out. Should it become material hereafter to consider what might be the effect of a departure from these requirements of Section 14, either on the rights of the creditor or the duty of the executive officer, that subject will receive attention in its appropriate place.

The conclusion, as bearing on the present question, is that the Constitution intended as a necessary requisite of every Act authorizing the creation of public debt that it should make full legislative provision for the imposition and collection annually of a tax sufficient in amount to pay the interest thus accruing, which Act, taken together with the other provisions of the Constitution referred to above, and the standing tax laws, should be full authority to the administrative officer to proceed to impose and collect the tax.

It is impossible to ascribe any reasonable motive and object to such a regulation, unless it was intended as a certain and unalterable provision for the payment of interest on all sums of money that might be borrowed under any such Act. It was in contemplation that these legislative provisions should be before the mind of the lender at the time he advanced his money, and that, according to their nature, they must act as an inducement to lend on favorable terms. Therefore, it must be assumed that the Constitution intended that these provisions should enter into the contract itself, and thus place the rights of the creditor, such as they might be, beyond the power of future legislative Acts to diminish his security.

It has been argued that these provisions, after all, do not complete any title or remedy in the hands of the creditor, because, although the tax should be imposed and collected, still the money cannot be claimed by the creditor, unless a specific appropriation be made authorizing its application to his payment. What effect such an argument might have if it rested on a foundation of fact, whether it would be regarded as virtually destroying all idea of remedy as associated with the requirements of the Constitution, or

as merely impairing the completeness of that remedy, need not be considered, for the Constitution itself operates as an appropriation of funds so collected and deprives the Legislature of all power of changing the destination of any such fund.

Section 4, Article IX, provides that "no tax shall be levied except in pursuance of a law which shall distinctly state the object of the same, to which object such tax shall be applied." These concluding words, in directing the application that shall be made of the funds resulting from the collection of such a tax, do all that it is the province of an appropriation to do. Should these words be placed in an Act of legislation authorizing the borrowing of money and levying a tax for the payment of interest on the money so borrowed, they would have to be construed as amounting to an appropriation or authority for the Treasurer to disburse such moneys towards the objects they were intended to subserve. In that case the object of their insertion in such Act would have to be regarded as identical with that sought to be enforced by the Constitution. If it had been intended that the Legislature should have any discretion as to the objects to which such funds should be applied, this clause would not have been inserted in the Constitution. Its insertion evidences the intent of the Constitution to deprive the Legislature of all power of misapplication, by an authoritative and imperative appropriation to the specific object set forth in the tax law as the ground of raising the specific tax. If the construction of the constitutional provision stopped short of this, it might entirely defeat the intent, for money might be raised by the Legislature under an Act strictly conformable to the Constitution as a mere pretext, and, afterwards, applied to any purpose desired by the Legislature. The efficient remedy was to stamp at once upon the fund the direction in which it should be disbursed, and thus effectually to appropriate it in the sense of Section 12 (Article IX,) which reads as follows: "No money shall be drawn from the Treasury but in pursuance of an appropriation made by law." An appropriation made by the Constitution itself is in every sense an appropriation made by law.

Thus it is seen that, in addition to the dispositions already referred to as made to furnish some sort of security and remedy to the holder of obligations issued under the Constitution, a disposition of the funds raised by taxation for the purpose of paying interest on such debt is made of such a nature that the disbursement towards

such object is an administrative act that may be compelled by the action of the Courts.

We come now to consider more narrowly the question raised by the respondent, that these requirements of the Constitution, as it regards provision by an annual tax for the payment of interest on the debt issued under the five Acts of the Legislature set forth in the several petitions of the relators, has not been complied with, and, therefore, the authority under which the relators' bonds were issued was incomplete and imperfect, and that the bonds are void. It is profoundly to be regretted that a necessity should arise compelling the law officer of a great State to urge a technical failure of duty on the part of the Legislature as the ground of holding invalid obligations contracted by the State, in form at least, and upon which the State has received, or must be assumed to have received some value. As painful as this duty may be, it is possible that a case may arise in which circumstances would justify the interposition of such a defense. The responsibility of determining the propriety of such a defense properly belongs to the law officer of the State, when that officer is before the Court, and with that question we have nothing to do. The point is made before us, and we must give it the consideration due to all questions of a judicial character presented before us.

In putting a construction on the language of the five Acts in question, we are bound to assume, unless excluded from that assumption by the clear terms of the statutes themselves, that the object of the Legislature in framing the clauses under immediate consideration was to comply with the requirements of the Constitution as affecting such clauses. This is an assumption always due to the public authority, and particularly to the law-making body, for it proceeds upon the idea that the discharge of public duty is the primary motive influencing the action of the public authority. The language employed in the five several Acts, as it regards the levy of an annual tax, differs in some subordinate respects, but all agree in substance. The language of the Act in petition No. 1 is " that an annual tax, in addition to all other taxes, shall be levied upon the property of the State sufficient to pay the interest on the loan hereinbefore authorized at the times when such interest shall fall due." The same language occurs in the Acts set forth in petitions Nos. 2 and 3. The language in the Acts in petitions Nos. 4 and 5 differs somewhat, and will be considered hereafter.

There is but one view of the language of the Acts just quoted which, if supported by the text of the statute, could by possibility lead to a conclusion that there was a failure of compliance with the requirements of the Constitution in this regard. If the language in question may be read as intending nothing beyond a mere declaration of an intent on the part of the Legislature to provide at some future time or times, by suitable enactments, for the levying of an annual tax to pay interest, and as communicating no authority that would warrant the executive officers in proceeding to make the imposition of the tax effectual, then it might with propriety be said that that which the Constitution intended had not been accomplished by the Legislature. Comparing this language with the Constitution, it becomes clear that the Legislature could have no motive to depart from the requirements of the Constitution such as a Court of Justice would be at liberty to impute to that body. To say that they intended non-conformity to the Constitution would be to charge dishonesty of motive, when the necessary bearing of such action on the rights of the bondholder is considered. We cannot admit such an assumption in the construction of this language. The primary and ordinary sense of the words used imports a command of something to be done, which is fully understood when we look into the standing tax laws. When the Legislature declares that a tax "shall be levied," the direct sense of the terms imports a command rather than a promise, if it is possible for these words to operate effectually as a command. It is only when they cannot operate effectually as a command that we would be thrown back, constructively, upon the conclusion that a promise was intended as to certain future action to be taken by the legislative body itself. These words are capable of full efficacy as a command, inasmuch as the standing tax laws afford all the means requisite to enable the tax to be completed as an administrative act. They must, therefore, be construed as commanding such acts as, under the standing tax laws, are requisite for the imposition and enforcement of the tax in question.

It has already been said that the Constitution intended that the action of the Legislature, preliminary to the creation of public debt, should be exhaustive of its authority, to the extent of a full provision for the payment of annual interest on such debt; it is not necessary, however, that the words introduced into the statute should express this idea. The Constitution fixing the force and ef-

fect of the statute is read with it, and it·is superfluous to repeat either the provision of the Constitution or its substance in the Act.

The language employed in the Act, in petition No. 4, is as follows, (14 Stat., 276, Sec. 5): "The faith and credit of the State is hereby pledged to the payment of principal and interest of said bonds, and a sufficient amount of taxes is hereby levied to pay the interest accruing on said bonds annually." The language here employed, in its primary sense, imports neither a command nor a promise, but the declaration of·a fact. The question is, whether such declaration is, in legal signification, equivalent to a command, as affecting the duties of the officer ·charged with the imposition and collection of taxes. It is clear that, unless it can operate as a command, it is entirely nugatory. We are, therefore, bound to look for some sense in the terms employed that would give them operation as authority to impose and enforce such tax by executive agency, and until such a construction is impossible we are not at liberty to declare it nugatory and meaningless. It is not·an unusual thing for an enactment intended to bring about a certain change to take the form of a declaration of the existence of such change. Such a declaration draws after it everything that is properly attendant and consequent upon the fact declared. If such declaration carries the force of law, the rights and duties of public officers, as well as of citizens, attach to the fact declared, and become conformed to it by a vital power operating in the system of the laws, and such modifications of right and duty are recognized and enforced by the Courts. Within these principles, perfectly self-evident, when an adequate experience of the operations of laws and government is present to enable them to be appreciated, there is no difficulty in finding the solution of the present question. The declaration of the fact that a tax was levied sufficient to pay interest estops and precludes the denial of such fact as effectually as if the statute was ·cast in the form of. a command, so that an executive officer who should refuse to perform a duty dependent on the fact thus declared would be compelled to contradict the express declaration of the statute in order to excuse his want of due compliance. This cannot be done. It is clear, therefore, that the fact declared must be held to exist according to such declaration, and the declaration.is, for all legal purposes, equivalent to a command to perform such things as'are proper, in order to conform therewith.

The same language as that last considered occurs in the Act set forth in petition No. 5, and must receive the same interpretation.

The objection of the respondent to the constitutionality of the Acts in question, on the ground that no such provision was made by tax for the payment of annual interest, is not well taken.

The next objection to the constitutionality of the Acts in question is applicable only to the Acts set forth in petitions Nos. 3, 4 and 5, and is, in substance, that those Acts were not passed by a constitutional vote of the Legislature. The exact point involved in this objection has been stated by the counsel for both parties to be, whether, under Section 7, Article IX, of the Constitution, it is competent to pass Bills intended to create a public debt by two-thirds of a quorum of each House, or only by two-thirds of the whole membership of each House.

The provision of the Constitution involved in this question is part of Section 7, Article IX, and is as follows: "And no such law shall take effect until it shall have been passed by the vote of two-thirds of the members of each branch of the General Assembly, to be recorded by yeas and nays on the journals of each House, respectively." The object of this provision was to create a check, operating directly on the respective Houses of the General Assembly, tending to limit the exercise of the power of creating public debt to cases where its expediency was determined as the result of a clear and solid judgment of the legislative body. Experience had shown that a mere majority does not necessarily express a conviction of that nature, but often depends on a mere accident, that, according to its occurrence, at one time or another, may reverse the conclusions of the deliberating body. Although this fact is well understood, it has not produced a change in the practice in cases involving ordinary subjects of legislation, probably because prompt and incisive judgment is generally the best, and, also, because tending to prevent the expense of protracted legislative sessions. Where, however, a strong temptation is present, tending to misdirect the judgment, an opportunity for reflection is of as much importance as unhesitating action is in cases free from such disturbing causes. A case of creating public debt frequently belongs to this class; for the satisfaction that will be afforded to a constituency, where a burden that ought to be met and provided for to-day is pushed over to a future time, is a ground of temptation to the representative of such a constituency to conform his vote to their present convenience.

These considerations have led to constitutional provisions requiring, in certain cases, that a greater number than a mere majority should unite where acts of a certain class of a more important character than the ordinary subjects of legislation are involved.

If the ground and motive of this class of constitutional enactments has been justly apprehended in the observations just made, then it is not difficult to draw a general conclusion that safely operates as a rule in construing such enactments.

As is usual in such cases, our Constitution fixes the quorum competent to transact business on a numerical basis. A majority of each House is competent to transact all business not embraced in certain special provisions requiring for action the concurrence of a greater number of votes than the number required to constitute such quorum.—Section 14, Article II. A quorum is, then, when competent to act for all legal interests and purposes, the "Senate," or the "House," as the case may be; and whatever authority is conferred on the bodies designated by such names, or upon the General Assembly as a whole, must be regarded as fully vested, for all actual purposes, in the quorum thus constituted. It is, indeed, for all legal purposes, as much the body to which it appertains as if all the component parts were present. When, therefore, either branch of the General Assembly is spoken of, in the absence of a clear intent to the contrary, the quorum of such body must be understood as intended. It would follow that provisions ascertaining the mode in which the body should divide, in order to complete action in any given case, whether by a mere majority or by a still greater proportion, must be interpreted primarily as applicable to the body as legally organized at the time such action is taken. If the rule is the mere majority rule, then a majority of the quorum present and acting is intended; if the rule is that of two-thirds, then two-thirds of such quorum must concur for effective action. This rule is substantially laid down in Cooley on Constitutional Limitations, page 141, on the authority of certain cases there noted. But the rule is, in itself, reasonable, and tends to harmonize together provisions of the Constitution that otherwise would, to some extent, conflict.

This rule becomes clearly applicable to the present case, when we consider the operation of certain clauses that require that a larger number of the membership of each House than is requisite to form a quorum shall unite for the purpose of action in certain

specified cases. Such an instance occurs in Section 12, Article II, where the city of Columbia is established as the seat of government " until otherwise determined by the concurrence of two-thirds of both branches of the whole representation." The effect of such a provision is to render the quorum, at the minimum point fixed by the Constitution, incompetent to act in a matter of that kind. In the instance just quoted from our Constitution, the expression " two-thirds of the whole representation " clearly indicates an intention that the minimum quorum shall not act. The words " whole representation " are not in common use in such connection, and cannot with propriety be used to describe the body as organized with a mere majority. If these words could be read so as not to interfere with the operation of Section 14, Article II, fixing the quorum, they should be so read, because that interpretation is the best that admits of the various enactments in different parts of the same instrument, and relating to the same subject-matter, to stand and operate together. Such an interpretation is precluded by the form of expression employed, denoting a clear intent to apply a different rule, in this respect, than that stated in Section 14. The subject-matter of this provision, namely, a legislative change in the seat of government, is a matter clearly beyond the range of ordinary legislation, affecting in an opposite manner the interests of different localities within the State, and there was manifest reason for requiring that a larger representation of local interests should take part in such action than would be requisite to constitute the minimum quorum.

Another instance of this class occurs in the Constitution at Sections 1 and 3, Article XV. Section 1 provides for the amendment of the Constitution by means of legislative action, submitted to, and ratified by, the qualified electors of the State at large. Section 3 relates to the calling of a Convention for the purpose of amending the Constitution. In both of these Sections it is required that legislative action on such subjects should be taken by a vote of " two-thirds of the members elected to each House," as expressed in Section 1, and " two-thirds of the members elected to each branch of the General Assembly," as expressed in Section 3. This language cannot receive its proper interpretation without limiting Section 14, which confers power to legislate on a quorum of a mere majority. The expression " members elected " is a common mode of denoting an intent that members having the right to participate are to be

counted with reference to a division by two-thirds, though not present nor as part of the quorum. It will be observed that the matters of legislation to which these provisions relate are highly exceptional in their nature. The instances cited from Section 12, Article II, and Sections 1 and 3, Article XV, are closely related to a common purpose clearly indicated by the Constitution. All these Sections propose to allow action to be taken by the Legislature, with a view to change the fundamental law, in the case of Section 12, Article II, as it regards the location of the seat of government, fixed by the Constitution, at Columbia, and in Sections 1 and 3, Article XV, as it regards the general power of amending the Constitution. It is, therefore, easy to conclude, from the necessary import of the language employed, the nature of the subject treated of and the obvious relation between the subjects involved, that it was intended to create exceptions, in those cases, to the provisions of Section 14, Article II, fixing the quorum.

Turning, then, to the clauses of the Constitution under immediate consideration, we find nothing in their language or intent, nor in the object in view, that necessarily precludes the full operation and effect of Section 14, Article II, in so far as it fixes the active constitution of the legislative body. Unless there is such a conflict, the expression " two-thirds of the members of each branch of the General Assembly " must, on the principles already stated, be held to relate to such body as organized in the manner provided in Section 14, Article II, namely, by the presence of a majority of the members elected to each House. As to the direct meaning of the terms " members of each branch of the General Assembly," it must be borne in mind that they are employed as a means of estimating the number of votes requisite in each House for the passage of a Bill authorizing the creation of public debt. In ascertaining the number involved in this expression, the question arises, is the whole number of persons entitled to sit in the legislative body, or the number constituting the different branches of the General Assembly at the time the vote is taken, that is to be considered. The time when this language begins to speak effectively in relation to any particular Bill is when a vote is taken upon it in either branch of the General Assembly. At that moment such branch is organized, under the Constitution, upon the basis of a certain number of votes. That number of votes is, for the time being, the actual basis of its organization, as upon it depends its legal right to legislate. It is

very clear that, without doing violence to the terms employed, they may be read as either relating to the possible number of votes or the actual number participating, our interpretation being the result of assuming the Constitution to speak of the General Assembly according to its general constitution, and the other as assuming that it speaks with reference to the actual state of its organization at the time the clause in question becomes practical and operative. The expression being thus indifferent, as it regards the choice between these modes of interpretation, the general considerations already developed must determine their proper sense.

The first of these considerations arises from the observation that in other parts of the Constitution, where it was intended to interfere with the power of a mere majority to legislate as a competent quorum, that intent was expressed by clear and unmistakable language, and that such language is omitted in the present instance. The inference is that the omission was intentional. This inference is strengthened to a strong probability when it is considered that the effect of introducing words having the force of those omitted would be to render inoperative another portion of the Constitution performing the important function of organizing the branches of the General Assembly for actual and practical purposes. This probability is converted into a certainty, if we can find that the object that was in view in the adoption of this measure can be fairly attained without destroying the constitutional authority of the majority as a quorum.

We have already adverted to that object as the securing of a sound deliberative judgment on the matter, unaffected by mere accident, and resting upon the relative strength of the opposite convictions that divide the legislative body. As a question of the effect of forms of proceedings upon the results of deliberation, it has nothing to do with the members constituting the Assembly, but with the ratios according to which it divides. A division by two-thirds, as applied to a body consisting of any number, is generally regarded as a fair test of the solid judgment of such body. It renders it necessary that the portion of the body having strong convictions in favor of a measure requiring a two-thirds vote should draw to their support the class of minds who, whether from temperament or their relation to the measure, are hesitating and doubtful, in order to receive favorable action. Of course the result is not absolute but approximate. Still it is regarded as desirable under the general

view that is entertained of the play of elements that enter into deliberative bodies. It is very obvious that if this is the object in view, counting in the result persons who have taken no part in the discussion, and can exercise no legitimate influence on its conclusions, involves a mere technicality or arbitrary principle, having no real bearing on the objects to be attained, by dividing the body in the ratio of two to one.

On the whole, the reason of the rule appears to be with the statement of it made by Cooley, and makes that rule practicable, judicious and reasonable, instead of a mere empirical and arbitrary test, with no other argument in its favor than the fallacy, very commonly indulged, that obstructing the course of legislation tends to keep it within its proper channels, even though the obstruction has no explanation in the principles governing the course of legislative action.

It must, therefore, be concluded that a vote of two-thirds of the members present at the time the vote was taken satisfies the requirements of the Constitution. The respondent's objections in this respect are not well taken.

We have now considered all the objections urged by the respondent, involving the question of the constitutionality of the five Acts of Legislature set forth in the relators' petitions, and find that they present no just ground of objection to the validity of either of such Acts.

We will next consider the various objections raised by the respondent to the validity of the bonds in suit, other than the constitutional objections just considered. The objections must be regarded as confined to the five bonds set forth in the several petitions of the relators, as those bonds constitute the only ground of right presented to this Court by the relators in respect of which judicial action can be demanded. This subject will be more fully considered hereafter in connection with the discussion of the remedy by *mandamus*.

The respondent's objections involve the inquiry, whether the bonds in suit are void. The question comes before us in the nature of a demurrer to the respondent's return, admitting all material facts properly pleaded, and taking issue upon their legal insufficiency to arrest the proceeding by *mandamus*.

The first objection to be considered relates to the bonds set forth in petitions Nos. 1, 2 and 3, and is as follows: "That by

the Act of the General Assembly, ratified August 26, 1868, under which said bonds purport to have been issued, it was expressly provided that the bonds authorized by said Act should be 'sold at the highest market price, by the Financial Agent of the State in the city of New York, and not less than for a sum to be fixed by the Governor, Attorney General and the Treasurer,' and this respondent is informed, and so charges the fact to be, that the said bonds were not sold in conformity with these requirements of the law."

The force of this objection depends upon the constitutionality and operation of an Act entitled " An Act relating to the bonds of the State of South Carolina," approved March 13, 1872, 15 Stat., 278. This Act recites that bonds had been issued from time to time to a large amount under the provisions of certain Acts of the General Assembly, recited by their titles, and including the five several Acts set forth in the petitions of the relators ; that doubts had arisen whether said issues were in strict conformity to the provisions of such Acts ; that it was the true intent and meaning of such Acts " that such issue of bonds or obligations should be made in the manner in which the same have been made as aforesaid." It also recites that " doubts have been raised as to the validity of some of the bonds mentioned in the said annual report of the State Treasurer for the fiscal year ending with October 31, 1871, although money has been borrowed by or realized out of said bonds on account of this State," and that " the credit of this State has been affected thereby." Section 1 declares that " the said bonds and obligations issued on behalf of this State, as mentioned and set forth in the report of the Treasurer of this State to the General Assembly, dated October 31, 1871, were duly and lawfully issued in conformity with the true intent and meaning of the several Acts of General Assembly hereinbefore set forth by their respective titles." Section 2: " That the acts of the officers of the State authorized under the provisions of the laws of this State, and of the several Acts hereinbefore referred to, to the extent of all issues of bonds or obligations enumerated and set forth in the said report of the Treasurer, be, and are hereby, in all things, ratified, confirmed and established." Section 3: " That each and all the bonds named in the annual report of the Treasurer for the fiscal year ending with October 31, 1871, be, and the same are hereby, declared to be legal and valid bonds of the State of South Carolina, for the payment of

which the faith, credit and funds of the State have been and are pledged : *Provided,* That no bonds be included which are not registered in the Treasury at the time of the passage of this Act, as provided by Section 14, Article IX, of the Constitution, relating to finance and taxation." The foregoing extracts from this Act, commonly known as the " validating Act," sufficiently set forth the object and intent of the Act.

It is averred by the relators, and not controverted by the respondent, that each of the five bonds set forth in the relators' petitions were issued under the Acts covered by the validating Act, prior to the passage of that Act, and that they are set forth and included in the report of the State Treasurer above referred to. They are, therefore, subject to the operation of the validating Act.

The question under discussion involves the five bonds in suit, and the discussion of the question will be confined to the effect of the validating Act on these bonds.

It is indisputable and undisputed that, if the validating Act is entitled to have the full force and effect intended by it, then the bonds in suit are validated, although the officers who issued them failed to conform to the several Acts authorizing the issue.

The objection taken by the respondent is, that the Act in question is unconstitutional and void in its operation on the bonds in suit. The proposition advanced by the respondent in support of this objection is, in substance, that the Act was not passed in conformity to the requirements of the Constitution already considered, so as to authorize the creation of public debt, and it could neither sanction the creation of a new debt nor impart validity to that which had no legal existence as debt at the time of its passage. It appears that the validating Act was not passed by a two-third vote, as required by Section 7, Article IX, in the case of an Act to authorize the creation of public debt. It will be conceded, therefore, that if the authority under which the bonds in suit were originally issued was constitutionally insufficient, such constitutional authority could not be afforded by the validating Act, for want of conformity to the constitutional requirements.

The only aspect of the respondent's proposition that need be discussed involves the idea that, assuming that the bonds in suit were not legal obligations at the time of the passage of the Act in question, inasmuch as it is claimed that, under that Act, they became a valid debt, such debt must be regarded as dating from the passage

of that Act, and, therefore, must be considered as new debt in the sense of the Constitution. The proposition just stated is here put in the form that appears to be most favorable to the respondent's position, and most fully bringing to light the real elements of the immediate question. Following the line of this assumption, that the bonds depended for their legal validity on the provisions of the validating Act, may they not still be regarded as standing on the footing of an issue under the original Acts, so that these Acts would be the test of the sufficiency of the constitutional authority under which they issued?

It is clear that it was no part of the intent of the validating Act to create a new debt or authorize its creation. Its design, so far as the present question is concerned, was to act exclusively on obligations deriving their constitutional sanction from antecedent acts of legislation.

It is a familiar principle, constantly applied in practice, that when an objection to the validity of an existing obligation in due legal form, is waived, such waiver acts back to the original contracting of such obligation. It is not regarded as bringing into existence a specifically new obligation. Thus, in an action brought upon the instrument containing such obligation, you may count directly on the obligation, as there stated, and the act of waiver need not be set forth as the foundation of the plaintiff's right. If the defect goes to the validity of the obligation, it is the proper subject of a plea. If it is of a proper nature to be waived, by matter of which the Court will take notice, such waiver acts by way of estoppel to shut out the bar, and the action proceeds on the idea of the original validity of the obligation sued upon. This is not a rule of form merely, but covers a substantial principle, tending to support the *bona fides* of dealings, in harmony with the requirements as to form demanded for the sake of certainty.

The objection under consideration, so far as it rests on technical grounds, is met by this technical view. As it involves a question of substantial rights, it remains to be considered. The true question is, then, had the Legislature constitutional authority to waive the objection to the bonds stated in the respondent's return and already quoted? The substance of this objection is, that, by the Act in question, the bonds should have been sold for the best prices attainable, while, in fact, they were disposed of in a different manner. It is clear, from the pleadings and the recitals of the validating Act,

that the State received some consideration for the bonds in suit, but what consideration does not appear. It is not alleged that any fraud was committed in the issue. The objection is want of com- pliance with statute requirements, as to the mode of disposing of the bonds. It is not alleged in what precise manner the bonds in suit were originally disposed of, but, assuming, for the sake of placing respondent's argument in the strongest light, that they were hypothecated upon a loan of moneys to the State, and the inquiry arises : Was the Legislature competent to waive such a want of compliance with its requirements ?

The Constitution does not prescribe the mode in which money shall be obtained, whether by borrowing on securities created for that purpose, or by the sale of securities. Such matters are left to the legislative discretion. Section 14, Article IX, provides : " Any debts contracted by the State shall be by loan on State bonds, of amounts not less than————." While it cannot be assumed that this provision was intended to make it necessary that all such transactions should take the exact form of a loan on bonds, so that selling bonds in the open market, to the highest bidder, would be a failure to comply with the Constitution, yet it is clear that it must be, in substance and effect, a loan on bonds. If, then, the Legislature had authorized the bonds to be issued, by way of security upon a loan of borrowed money, it would not only have been a substantial compliance with the requirements of the Constitution, but it would be, in point of form, a transaction more strictly conformable to the expressions of Section 14 than a sale in open market to the highest bidder would have been. It appears, therefore, that the Legislature possessed authority in the first instance to authorize the mode of disposition claimed by the respondent to have been employed in the case of the bonds in suit. Thus we have all the elements requi- site to the application of the ordinary rule of waiver, so familiar that it need not be stated at large, nor fortified by authorities. The Legislature had undoubted authority to waive want of conformity as to a matter purely within its own discretion, and such was the subject-matter of the respondent's objection, now under considera- tion. This is the idea of justice that, under the form of law, the State imposes upon citizens, as the test of rectitude in their mutual dealings, and it can claim for itself the benefit of no other code of morals or rules of fair dealing than such as it makes a part of its legal and judicial system.

An objection is taken to the bonds set forth in petitions 4 and 5, as follows: "That a large portion of the bonds issued under said Act have been returned to the State Treasury upon the substitution in their stead of other bonds of the State, and this respondent is informed, and so charges the fact to be, that the bonds so returned, and thereby redeemed and paid, have been re-issued without warrant of law." This averment, as it stands, is immaterial. It is not alleged that the bonds set forth by the relators are affected by the fact alleged. As the pleadings stand, the relators have no interest in the matter pleaded, because, as matter of pleading, they have not been connected with it by respondent's allegation. Assuming that the fact, as alleged, should stand as admitted, it would not in law affect the relator's right to the remedy he asks, because the law cannot supply the defect of the pleading, namely, an averment that the bonds in suit were so paid and unlawfully re-issued. It is a misapprehension to suppose that the rules of law are to receive some peculiar and unusual exposition when matters affectng the interest of the State, or transactions affecting incidentally many persons, are brought before the Court for adjudication. The opposite fact constitutes a chief recommendation of a government of laws. The pleadings of the Attorney General, in behalf of the State, must be judged by the same rules that govern the humblest citizen, nor does such equality work hardship to a State with resources ample to advance and protect its interests before the Courts.

The objection urged by the respondent to the validity of the bonds set forth by the relators being found insufficient, this Court is bound to regard the bonds as valid; and the next question presents itself, whether the relators are entitled to any remedy, and, if so, whether the remedy demanded is appropriate.

The only remedy that is appropriate is that by *mandamus*. Have the relators shown a case proper for the issue of that writ? To be entitled to the writ, the relators must show that the respondent is bound to the performance of some specified duty imposed by law, of a ministerial character, and in the performance of which the relators have a legal interest. This Court has had frequent occasion to consider the nature of this remedy and the grounds upon which it can be claimed, and it will not be necessary to review the general doctrines on this subject or the authorities by which they are enforced. It will only be necessary to examine the various objections made by the respondent as to the question whether this case can be brought within the terms of the rule governing the issue of the writ.

In examining the various objections, it must be borne in mind that, as we have already found, the intent of the Constitution was to secure an exhaustive exercise of the legislative power in an Act authorizing the creation of public debt, so that nothing should be wanting in order that annual interest may be paid on such loan. But what could be attained by the performance of a mere ministerial act that might be compelled by the Court? This clear intent is not all that is necessary to complete relators' title to the writ. It must also appear that this purpose of the Constitution has been substantially carried out; otherwise it might happen that the intent of the Constitution might fail, on the ground that, not being in itself self-executing, the Legislature had failed to furnish the means necessary to its efficiency. We have already held that the five Acts are to be construed as having accomplished what the Constitution intended, as it regards the communication of authority to levy a tax for annual interest. So far, the relators' position is sustained. It remains to be seen whether the laws fixing the duties of the Comptroller General and the standing tax laws, prescribing his line of duty in the case of a levy of a tax, devolves a clear and certain specific duty upon him, which, if performed, would accomplish the intent of the Constitution and the five Acts authorizing the creation of public debt stated in the relators' petitions. If such is found to be the case, and it shall appear that such duty is of a ministerial character, as affecting the relators, then the claims of the relators to the writ in some form will be perfect.

A duty imposed by law is specific when a case or state of circumstances exists proper for its discharge. A specific duty may arise in two ways. It may be imposed directly, as when a public officer is directed by statute to execute a particular conveyance to a person by name, or it may arise out of a general duty imposed by law, as where a case or state of circumstances has arisen such as was in the contemplation of the law imposing such general duty as the object and occasion of its exercise. In either case the duty becomes specific the moment a proper occasion arises for its exercise.

A duty is certain, when, by law, it must be absolutely performed, and the occasion, mode and term of its exercise are fixed so that nothing remains subject to the discretion of the officer. The fact that a reasonable doubt exists as to some necessary fact on which the duty of performance depends does not interfere with the

certainty of the duty where the ascertainment of such fact is the proper subject of judicial inquiry, for in that case the officer, if doubtful as to the fact, may put the party demanding performance to proof of such fact in a proper judicial proceeding, as in *mandamus*. It is proper to remark, although it may not be material as bearing on the present case, that where, as is sometimes the case, a public officer or a public body is clothed with power to determine conclusively the existence of any fact as bearing on the performance of a public duty, a discretion on the part of the officer may exist interfering with the certainty of the duty demanded, so that a Court might not be justified in treating such fact as a matter for judicial ascertainment, when the remedy seeks to enforce specifically such duty. Such a case sometimes occurs in regard to the duty of auditing public accounts.

A duty is ministerial when an individual has such a legal interest in its performance that neglect of performance becomes a wrong to such individual.

We come now to the application of these principles to the questions presented by the respondent's remaining objections to the remedy.

Respondent contends that the duty sought to be compelled is not his " clearly prescribed ministerial duty." The first proposition stated in support of this objection is that " the authority to ascertain and determine the rate or per centum of taxation is delegated by the Constitution to the General Assembly, and not to the Comptroller General or to any other State officer, while the duty of the respondent, in this regard, is solely to give notice annually, on or before November 15th, of the rate or per centum so by the General Assembly ascertained, determined and authorized."

There are two distinct propositions involved in the foregoing. The first is, that under the Constitution the ascertainment of a rate or per centage to be applied to the assessed value of the taxable property must be completed by the General Assembly, and cannot be devolved on any other official. It would certainly be unaccountable, if the Constitution had rendered it necessary that a mere arithmetical computation should be made by the General Assembly, and should deprive that body of the authority to direct such computation to be made by some subordinate officer. To furnish to the executive officer the necessary data for making the computation, and to leave to him the duty of ascertaining the

result, is the constant practice of legislative bodies. In order to ascertain the rate or per centum to be applied to the value of taxable property, two things are necessary—first, to ascertain or fix the aggregate amount of money intended to be raised by the tax; second, to ascertain the aggregate assessed value of the taxable property of the State. When these data are obtained, by dividing the latter by the former the rate or per centage of the tax is arrived at. Under the tax laws the aggregate value of the personal property has usually been ascertained after the passage of the law authorizing the levy. Since 1869, the Legislature has given the rate to be levied instead of fixing a gross sum to be raised, as was done in the last mentioned year. The consequence is that in the ascertainment of the rate for the various tax levies since 1869, the Legislature was compelled to assume, approximately, the aggregate value of taxable property from data afforded by preceding years, inasmuch as the basis of the tax ordered could, under the tax laws, be ascertained only as the result of an assessment that was to take place subsequent to the enactment fixing the rate. If the Legislature had deemed it most convenient to indicate the sum to be raised, and left it to the executive officer to ascertain the rate after the assessment was completed and the aggregate value of taxable property known, as was done in 1869, there is no good reason why they should have been precluded from so doing, unless, as respondent says, the Constitution forbids it. The nicest scrutiny of the Constitution fails to discover any clause or expression looking towards any such result. That instrument is absolutely silent on the subject in question. If such a construction arises at all, it must be from all or some of the Sections of the statute already quoted, while there is not in them the least ground for such a construction. The Legislature possesses full authority to resort to either mode of arriving at the result, as they may judge most expedient.

It is not unusual for an executive officer to assume that the habitual practice of his office is the true exponent of the Constitution, nor would the existence of such a supposition devolve upon the Court the duty of entering at large upon the fallacy involved; but when, as in the present case, the point is urged by the Attorney General with great apparent confidence, and the construction contended for tends to strip the Legislature of a choice of modes of action essential to facilitate the discharge of its important duties, it is incumbent to look carefully into the proposition to see whether it

springs from an appreciation of the principles and practices of government that underlie the Constitution, both historically and logically, or whether it has been discovered as the result of a technical research, inhering, in the language of that instrument, as one of the accidents of expression often occurring and readily eliminated if approached in a constitutional spirit.

The second proposition associated with that just considered is based upon the language of the general tax Act, prescribing the duties of the State Auditor, these duties having, since the passage of that Act, been devolved by law upon the respondent as Comptroller General. The provision of law referred to is found in the General Statutes, at page 71, (Section 72,) and is as follows : " The State Auditor shall also, on or before November 15th, annually, give notice to each County Auditor of the rates or per centum authorized by law to be levied for the various State purposes, which rates or per centum shall be levied by the County Auditors on the taxable property of the County, and charged on the duplicate with the taxes required to be levied and collected for other purposes. The respondent is correct in regarding this clause as covering the only duty that can be enforced by *mandamus* in the present case. But the respondent is clearly incorrect in assuming, as the proper inference to be drawn from it, that his only duty is to communicate to the County Auditors a rate or per centum already fixed in terms by some Act or Joint Resolution of the General Assembly. If this was its only office, it would be entirely superfluous, for the County Auditors could, with equal certainty and convenience, get that information from the terms of the legislative Act. On the contrary, it will appear, on close examination, that under this clause it becomes his duty to ascertain that rate by computation, when it has not already been fixed in terms by the Legislature, but the data for such computation are afforded.

It is clear that this clause makes it the duty of the respondent, in his instructions, to communicate a rate or per centage to the County Auditors, but, according to its true construction, is he only bound to make such communication when such rate has been fixed in terms by the legislative body ? In other words, may he lawfully refuse to take the necessary steps in order to provide means by taxation for the purposes of the State Government, unless the Legislature has cast its authority into a particular form and has stated the exact rate to be levied, notwithstanding that rate may be obtained

by calculation from data given by the Legislature for that purpose?

The answer to this depends on the construction to be given to the words " the rate or per centum authorized by law to be levied for the various State purposes."

A rate ascertained as the result of that which is enacted may be regarded as authorized by law, as well as a rate declared in terms. The authority of the law communicated by a statute must be regarded as covering not only the matter immediately treated of, but as extended to, and covering, all that naturally and properly should flow as a consequence or result of such matters. Had the statute used the words " declared by law," instead of "authorized by law," it would afford some evidence of an intention on the part of the Legislature to communicate legal authority to impose taxes in the form of the declaration of a rate to be imposed, although, in that case, the word " declared " might be read by the context as equivalent to " authorized." There being, then, two senses that are equally within the ordinary meaning of the terms " authorized by law," the one embracing all matters directly expressed by the statute and the other all other matters properly consequent upon, or resulting from, such expressed matters, we must resort to the object and intent of the Act, in order to ascertain whether there is any thing that renders it necessary or proper that the words in question should be taken in the narrower sense.

The general tax law, in which this language occurs, contains provisions for ascertaining what property is subject to taxation, for the appraisal of the value of such property, for ascertaining the amount due from each tax-payer, and for the collection of the taxes and accountability of the various officers discharging the duties imposed by it. The clause in question occurs after the provisions that have regard to the ascertainment of the aggregate value of taxable property and before the provisions in regard to making up the record of taxes imposed, or duplicates, as they are called by the Act. The tax lists are made by the respective County Auditors, in accordance with the ratio or per centage directed by the respondent. Assuming that the respondent is to ascertain the rate by dividing the aggregate valuation by a gross sum to be raised, then the convenient time for giving directions would be exactly that fixed by the statute. The time when this act is to be performed, so far from affording any indication of an intent to exclude the respondent from this

duty, actually arranges the order of procedure, so as to facilitate its performance on his part.

The immediate object of the clause in question was to provide the means by which the County Auditors should obtain information requisite to enable them to make complete statements of the sums imposed as taxes. This object is equally obtainable, whether the rates are declared by the Legislature or computed by the respondent. There is nothing in the Act tending to limit the sense of the words in question from taking effect according to the broadest sense.

The same General Assembly that adopted the general tax law, at its next session, gave a particular construction to the words in question by directing the Auditor of State to raise and collect "a sufficient per centum of taxes to raise the necessary amount of moneys upon the assessed valuations of the property of the State to meet the appropriations enumerated in this Act: *Provided*, There shall not be assessed and collected, under the provisions of this Act, an amount exceeding one million of dollars." This is a clear instance of contemporaneous exposition, in harmony with the view just presented, placing beyond reasonable doubt the construction that it is competent for and the duty of the respondent to ascertain and declare the requisite rate of percentage when either a fixed or ascertainable sum is authorized by law.

The next objection is, that " neither the rate nor per centum necessary to pay the interest due and to become due upon the bonds referred to in the petitions, nor the rates or per centum to be levied for the various State purposes on or before November fifteenth next, have been ascertained and authorized by the General Assembly, and the respondent is, therefore, without the authority requisite to the performance of his duty in the premises."

So far as this objection depends on the idea that the rate must be computed by the Legislature, it has already been disposed of. But there are other matters in it that call for notice. It must be confined to the question whether a writ of *mandamus* can issue requiring the respondent, on the fifteenth of November next, to communicate to the County Auditors the amount required to pay the interest due or to become due on the five bonds mentioned in the petitions. The amount requisite to pay the interest on the bonds in suit is ascertainable from the bonds themselves, and its correctness can be checked by the registry in the State Treasurer's office. In order to get at the

requisite data, all that is required is an arithmetical computation, based on the aggregate value of taxable property, as ascertained under the provisions of the general tax law. That law provides that such aggregate valuation shall be ascertained prior to the fifteenth day of November next, and we must assume that the requirements of the Act will so far be complied with at that time as to enable respondent to ascertain and add to any and all other rates the requisite rate for the purpose contemplated by this proceeding. The fact that the rates required to be imposed at that time for all other State purposes are unascertained is altogether unimportant, as it will be the duty of the respondent to add to the rate required in this case whatever may be the rate required for other purposes.

The respondent charges "that a large number of the bonds issued in pursuance of the Acts referred to in the relators' petitions have been returned to the State Treasury and there redeemed by the substitution of other bonds of the State, so that the number of bonds outstanding is unknown to this respondent and cannot be ascertained without inquiry and the exercise of discretion, which do not pertain to the office or the duty of this respondent; and this respondent submits that if the duty of ascertaining the rate or per centum, as demanded by the petitioners, was devolved upon him by law, he would be without the data requisite to its performance." If in ascertaining the rate it became necessary to fix it with reference to all outstanding bonds of the classes indicated, it would be necessary to ascertain the various matters to which the proposition has reference. In that case, it would still be a question whether the matters to be ascertained were not a state of facts proper for judicial inquiry rather than one to be solved by the legislative or executive authority. Under the view taken of this case, that consideration is altogether unimportant. As has already been said in regard to another objection of the same character, it cannot be held as directly affecting the validity of the bonds in suit, for it is not alleged that they were among those referred to, such an allegation being indispensable in order to raise a material issue touching the validity of the bonds. The objection assumes that, under the relators' petitions, this Court is bound to take into consideration all bonds of the various classes issued under the five Acts set forth by relators, and that the *mandamus*, if issued, must provide the means of paying interest on all such bonds. That this is an incorrect conclusion will appear from what follows.

The nature of the remedy and the character of the particular

relief demanded limit the case to the ground or claim specifically set forth. The whole ground, of right, is covered by the five bonds in suit. Looking, then, to the nature of the remedy, we should bear in mind that the judicial department of the government has no general duty or mission to see that the incumbents of other offices perform their duties. It is not any right lodged in the Court or Judge, as such, to demand a due performance of public duties by others; that is the foundation of the jurisdiction in cases of *mandamus*. A different idea may have prevailed when that writ issued out of the royal prerogative, for the King had a direct right to require all public officers to perform their duties. But, at all events, since the writ has taken its place as a special remedy, proceeding according to the course of the common law, it is subject to the principle that it is the right of the party, and not of the Court, on which judgment proceeds. The whole duty of the Court is to speak the law according to the fact, as may be demanded by the rights of parties appearing before it. When the State is a real party, its right to compel particular action on the part of a public officer is a proper subject for judicial action. If, in the present case, the public authority should be properly represented before us, demanding the performance of a general duty on the part of a public officer, the question would present very different characteristics from those involved in the proceeding as it stands. The case belongs to a class in which the State is merely a nominal party, lending its name to relators, as a means of maintaining their individual rights. The measure of our duty is not the right of the State to compel specific action, but of the relators to demand such action as bearing on their rights in controversy.

It is true that sometimes an individual party may draw into controversy the rights of others in conjunction with his own. This is when his individual rights appertain to a class of right held by a number of persons having a common interest in some particular remedy. In such cases, necessity and convenience sometimes lead to the allowance to such party of a qualified power of representing the class of which he is a member. This is done in equity, where the modes of proceeding are elastic and admit of the consideration of right and equities as existing among the individuals who, together, form one of the contending parties to a suit, as well of the matters in contest between the leading contending parties. Whether it is possible to introduce this feature into the practice, under a common

law remedy, by *mandamus*, need not be considered here, for the relators do not assume to represent class rights or interest, nor do they ask any remedy in respect of rights other than their own. It follows that, inasmuch as the remedy must be measured by the right of the relators to demand it, and that right is limited by the rules of pleading to whatever may be essential to the specific matters alleged by them, we must confine our judicial action to the case made on the five bonds set forth in the petitions.

If the case were otherwise, it is not clear that any judgment that we might pronounce affecting the title of parties not before the Court could conclusively bind them. The Court, under this writ, can exercise a certain discretion in refusing it, and that discretion might be wisely exercised if it became the means of withholding us from pronouncing a judgment ineffectual for the purpose intended by it.

The remedy demanded by the relators will not render it necessary for the respondent to undertake the duties to which the objection relates, and it must, therefore, be regarded as irrelevant.

The respondent objects "that the notice of the rates or per centum authorized by law for the current fiscal year, having been already given by the respondent, there is no authority for the notice of any other rates during the current fiscal year." Respondent's position is, in substance, that the annual tax for the current fiscal year has already been levied and collected, and that he has no authority, and is under no obligation, to impose an additional tax, embracing the matters in question, to be levied and collected as part of the taxes for the current fiscal year. His position is, in this respect, correct. We can only command that which he would be bound to do without our command. He certainly would not be bound to give notice to the County Auditors of a rate to be levied prior to the 15th of November next, for there exists no legal means by which such a tax could be effectively imposed. The imposition of a tax is the result of a series of efficient acts performed by various public officers having different classes of duties and performing them at the times fixed by law. Without the aid of the Legislature, this machinery could not be put into motion at a time in respect to which no active duties are demanded by the statute, or where duties of an inconsistent character are demanded. It would not, therefore, be competent for the Court to order such duties to be performed.

VOL. 4—31

Respondent alleges "that if the rates or per centum for the fiscal year to commence November 1, 1873, are ascertained and authorized by law, the petition for *mandamus* to require the respondent to give notice thereof to the County Auditors before the 15th day of November is premature, and, according to established practice, cannot be granted." The result of this objection, considered with the one last noticed, would, according to the idea of the respondent, be, that prior to the 15th day of November it would be too early for the fiscal year commencing on that day, and after that day too late for the fiscal year that closed on the day previous. This would destroy the remedy for all useful purposes. Technical rules are valuable where they advance remedies or prevent their abuse, but it is not their province, or within their power, to destroy the remedy itself. The rule contended for would lead to a mere mockery of justice. Giving to the statute and the rules of law a reasonable construction, a refusal of the respondent to perform this duty even before the 15th day of November must be considered as equivalent to a total want of performance for all remedial purposes, inasmuch as the 15th day of November was fixed, not as the day proper for the doing of the act, but as a period to mark the default of the respondent, should it remain unperformed; and, therefore, as he may perform on a previous day, refusal on such day to perform altogether is evidence of a default as affecting the right of a party to a civil remedy. If the respondent, in his return, had either denied the fact of refusal alleged in the petition or alleged his willingness to perform, that would, if undisputed, have ended the case. The matters set forth by the return must be regarded as equivalent to a statement on the record that he does not mean to perform the act demanded, leaving to us simply the question whether he is bound to perform it.

The objection of the respondent that the writ would be ineffectual without an appropriation by the General Assembly of the moneys to be collected by the tax demanded, so as to enable the relators to receive the product of such tax, is not well taken. If the want of an appropriation would, under any circumstances, defeat the right to the remedy demanded, still that could not affect the present case, for, as we have seen, the moneys arising from taxes of the class to which the one sought belongs are appropriated effectually by the Constitution itself.

The next objection is, "that by the provisions of the Act of the

General Assembly approved March 23, 1872, referred to in para-graph two of the said petition, a registration of all the bonds and stocks of the State is authorized and directed to be made, and it is in terms declared that the State Treasurer and Financial Agent of the State in the city of New York shall not pay interest on the said bonds and stocks until they have been registered according to the requirements of the said Act. That this respondent is not in-formed whether the bonds referred to in the petition have been, and he here charges that they have not been so registered, and he sub-mits that until such registration be complete the judgment of this Court requiring the levy of a tax to pay interest thereon would be nugatory and void."

If the duty of the Treasurer, as it regards the disposition of moneys derived from a tax laid for the purpose of paying interest on the bonds in suit, depended wholly on such action as the Legis-lature may take, even after the bonds had passed into the hands of private owners, it might happen that such moneys could not be disbursed until some requisite, like that of the legislation referred to, had been complied with. But in the present case, as we have already seen, these duties are fixed by the Constitution as part of the remedial means for the payment of interest, entering into the contract for the payment of such interest, and, therefore, any legis-lation tending to impose on the creditors of the State conditions other than those stipulated in the contract as prerequisites to pay-ment in the mode and manner contracted would clearly tend to impair the obligation of such contract and would be ineffectual.

The respondent objects that *mandamus* cannot be allowed order-ing a levy to pay a debt until such debt shall first have been ascer-tained by the judgment of a Court and the payment refused there-for ; and as in no case can judgment be rendered against the State, no foundation can exist for the issuing of the writ. No such prac-tice prevails in Courts having original jurisdiction to issue the writ, and in cases of the nature of the present, though such a rule obtains in the Circuit Courts of the United States, arising from their want of original jurisdiction by *mandamus;* but they use the writ merely in aid of their other powers. In the present case it is not a judgment that is the proper foundation of the relators' demand, but it is the allegation of the refusal of an official act enjoined by law, of such a nature as to be capable of enforcement, and the non-per-formance of which constitutes a wrong as affecting the rights of the relators. The objection is, therefore, without force.

The objection to levying a rate as to the bonds in suit, without authorizing a rate as to the interest on the entire residue of the bonded debt of the State, has already been disposed of and need not again be noticed.

The objection that, under the Act of March 13, 1872, provision was made for ascertaining the true amount of the public debt, affords no ground for refusing the *mandamus*, as it rests on the idea that the question of the validity of the obligations of the State properly belongs to the Legislature. A more complete view of the proposition of the respondent, in this respect, is found by considering the next objection with that last noticed. It is as follows: "That by the Constitution of this State the power to contract a public debt, and to provide for the mode and manner of its payment, is delegated exclusively to the General Assembly; that the time at which, and the mode in which, provision shall be made for its payment involve questions and considerations of public policy which can only be determined, in law and right, by the General Assembly; that any interference therewith by the Judicial Department of the government is expressly prohibited by the Constitution.

Doubtless, if the Constitution had not stamped a different character from that stated on the class of rights brought into view by the relators' case, the parties before the Court would have stood as general creditors of the State, and, so far as it regarded the means to which they would be compelled to look for payment, the proposition involved in the respondent's objections, just stated, would have been in the way of any appeal to the judicial arm of the government. The Constitution, however, as we have elsewhere seen, intended to impress a different character on rights of this particular class, as it regards a certain limited remedy, and it is only to the extent of affording such limited remedy that this Court can go. We are as much bound to conform to the special intent of the Constitution in the given case as to conserve the principles and rules that mark the ordinary distinction between the great powers of the State—executive, legislative and judicial.

The objections interposed by respondent have been examined and are found to afford no sufficient ground for refusing the writ. It must issue, and an order therefor will be made.

*Moses,* C. J., and *Wright,* A. J., concurred.