718 S.E.2d 210

BOARD OF TRUSTEES OF the SCHOOL DISTRICT OF
FAIRFIELD COUNTY, Plaintiff/Joint Petitioner,

v.

STATE of South Carolina and Legislative Delegation
of Fairfield County, Defendants,

of whom Legislative Delegation of Fairfield
County is Defendant/Joint Petitioner,

and

Glenn F. McConnell, in his representative capacity as President
Pro Tempore of the South Carolina Senate and as representa-
tive thereof; Robert W. Harrell, Jr., as Speaker of the House of
Representatives and as a representative of the South Carolina
House of Representatives, Intervenors/Joint Petitioners.

No. 27035.

Supreme Court of South Carolina.

Heard Nov. 30, 2010.

Decided Aug. 29, 2011.

Rehearing Denied Oct. 20, 2011.

Armand Derfner, D. Peters Wilborn, Jr., and Jonathan S. Altman, all of Derfner, Altman & Wilborn, of Charleston, for Plaintiff/Joint Petitioner.

Attorney General Alan Wilson and Assistant Deputy Attorney General J. Emory Smith, Jr., both of Columbia, for Defendant.

Robert E. Stepp, Robert E. Tyson, Jr., and Roland M. Franklin, Jr., of Sowell, Gray, Stepp & Laffitte, all of Columbia, for Defendant/Joint Petitioner.

Michael R. Hitchcock, John P. Hazzard, V, and Kenneth M. Moffitt, all of Columbia, for Intervenor/Joint Petitioner Glen F. McConnell.

Bradley S. Wright and Charles F. Reid, both of Columbia, for Intervenor/Joint Petitioner Robert W. Harrell, Jr.

Justice KITTREDGE.

This case is before this Court in its original jurisdiction. Plaintiff Board of Trustees of the School District of Fairfield County (Board), Defendants State of South Carolina and the Legislative Delegation of Fairfield County (collectively, the State), and Defendant–Intervenors House of Representatives and the Senate (collectively, the General Assembly), jointly petition this Court to determine the constitutionality of Act 308 of the South Carolina Acts of 2010 (Act 308). The Board raises two challenges to the constitutionality of Act 308. First, the Board asserts the General Assembly did not override the Governor's veto of Act 308 in accordance with Article IV, section 21 of the South Carolina Constitution. Second, the Board asserts Act 308 is impermissible special legislation in violation of Article III, section 34 of the South Carolina Constitution. Because we find the General Assembly did not

override the Governor's veto of Act 308 in accordance with our constitution, we enter judgment for Plaintiff, the Board.

## I.

### Procedural Background

In January and February of 2010, the South Carolina General Assembly passed Act 308, which transferred the oversight of financial operations of the Fairfield County School District from its board of trustees to a finance committee to be appointed by the Fairfield Legislative Delegation. Governor Sanford vetoed Act 308 on February 24, 2010. On March 2, 2010, the House of Representatives voted to override the Governor's veto by a vote of 33 to 10. At the time of the vote, a quorum (or majority) of the House was present. Specifically, 120 representatives were present for roll call, although only 43 representatives voted on the matter. H.R.J. Res. 135, 118th Gen. Assem., 1st Reg. Sess. (S.C.2010). On March 4, 2010, the Senate voted 1 to 0 to override the Governor's veto. S.J. Res. 135, 118th Gen. Assem., 1st Reg. Sess. (S.C.2010). On that day, although a quorum of the Senate was present, only Fairfield County Senator Creighton Coleman voted. The 1 to 0 vote was in accordance with a purported "long-held precedent in the Senate where members do not vote on legislation affecting solely one county, also known as local legislation." *Id.*

On August 27, 2010, the Board filed a complaint against the State in circuit court challenging the constitutionality of Act 308. The circuit court granted the Board a temporary restraining order. The General Assembly then moved to intervene, after which the Board and the State jointly petitioned this Court to take the case in its original jurisdiction. We granted the original jurisdiction petition.

## II.

### Article IV, section 21 of the South Carolina Constitution

Article IV, section 21 of the constitution provides that if the Governor vetoes a bill or resolution, the bill or resolution is returned with objections to the originating house, and:

If after such reconsideration *two-thirds of that house shall agree to pass it,* it shall be sent, together with the objections, to the other house, by which it shall be reconsidered, *and if approved by two-thirds of that house* it shall have the same effect as if it had been signed by the Governor.

S.C. Const. art. IV, § 21 (emphasis added).

The question before the Court is: what does the constitutional mandate "two-thirds of that house shall agree" mean? This Court's precedent and a plain reading of this unambiguous constitutional provision combine to compel a construction that the two-thirds requirement means two-thirds of a quorum "shall agree." Indeed, that has been the General Assembly's longstanding understanding and application of its veto override authority, until relatively recently.

**A.**

We begin with the acknowledgement that absent a constitutional mandate providing otherwise, each house in the General Assembly determines its rules of procedure free from interference from the judicial and executive branches. S.C. Const. art. III, § 12. We further note the premise that, absent a constitutional provision to the contrary, the legislature acts and conducts business through majority vote. The South Carolina Constitution provides "a majority of each house shall constitute a quorum to do business...." S.C. Const. art. III, § 11. Yet, the people of South Carolina, through their constitution, have established certain areas that require a supermajority of the legislature to act. The constitutional grant of legislative authority to override a governor's veto is one such example. *See also* S.C. Const. art. XV, § 1 ("The affirmative vote of two-thirds of all [Representatives] elected shall be required for an impeachment."); art. XV, § 2 ("No person shall be convicted except by a vote of two-thirds of all [Senators] elected."); art. XVI, § 1 (requiring two-thirds "of the members elected to each House" to approve a constitutional amendment); art. XVI, § 3 (requiring "two-thirds of the members elected to each branch of the General Assembly" to call a constitutional convention).

In *Smith v. Jennings,* 67 S.C. 324, 45 S.E. 821 (1903), this Court considered the meaning of the legislature's constitution-

al veto override authority juxtaposed to other constitutional provisions requiring a supermajority:

> While the Constitution, in article 3, § 3, declares that the House of Representatives shall consist of 124 members, it also declares, in section 11, art. 3, that a majority of each house shall constitute a quorum to do business. A quorum, therefore, possesses the power of the whole body in all matters of business wherein the action of a larger proportion of the entire membership is not clearly and expressly required. So, ordinarily, when a quorum is present acting, the House is present, acting in all its potentiality. When the Constitution speaks of "two-thirds of that house" as the vote required to pass a bill or joint resolution over the veto of the Governor, it means two-thirds of the house as then legally constituted, and acting upon the matter. Whenever the framers of the Constitution intended otherwise, the purpose was expressly declared, as in article 15, § 1, "a vote of two-thirds of all members elected shall be required for an impeachment," and in article 16, § 1, where, in proposing amendments to the Constitution, "two-thirds of the members elected to each house" must agree thereto. Questions like this arose under the Constitution of 1868, and were decided in accordance with the view we take. *Morton, Bliss & Co. v. Comptroller General,* 4 S.C. 462; *Bond Debt Cases,* 12 S.C. 285 [ (1879) ]. *See also, Cooley's Constitutional Limitations* (5th ed.) p. 170; *State v. McBride,* 4 Mo. 303, 29 Am. Dec. 636 [ (1836) ]. As the house at the time of the passage of the joint resolution was lawfully constituted, with 85 members present, and, as 60 of these voted for its passage, the vote was "two-thirds of that house," in the sense of section [21], art. 4, of the Constitution.

*Id.* at 328–329, 45 S.E. at 823.

We interpret *Smith v. Jennings* to manifestly require two-thirds of a quorum to override a governor's veto.[1] We find further support for our view in the authorities favorably cited in *Smith v. Jennings,* including *Morton, Bliss & Co. v. Comptroller General,* 4 S.C. 430 (1873). In *Morton, Bliss,* we were

---

1. That requirement was met in *Smith v. Jennings,* as a quorum was present with 85 House members and 60 of those "voted for its passage." *Id.* at 329, 45 S.E. at 823.

asked to determine, in the context of bills creating public debt, whether the constitution required "two-thirds of a quorum of each House, or ... two-thirds of the whole membership of each House." *Id.* at 462. The Court emphasized that a quorum is authorized to act in the name of the body[2] and "if the rule is that of two-thirds, *then two-thirds of such quorum must concur for effective action." Id.* at 463 (emphasis added). The Court concluded "that a vote of two-thirds of the members present at the time the vote was taken satisfies the requirements of the Constitution." *Id.* at 467 (emphasis added).

*Cooley on Constitutional Limitations,* referenced in *Morton, Bliss,* correctly states the rule in light of the unambiguous language in article IV, section 21:

> For the vote required in the passage of any particular law the reader is referred to the constitution of his State. A simple majority of a quorum is sufficient, unless the constitution establishes some other rule; and *where, by the constitution, a two-thirds or three-fourths vote is made essential to the passage of any particular class of bills, two-thirds or three-fourths of a quorum will be understood,* unless the terms employed clearly indicate that this proportion of all the members, or of all those elected, is intended.

---

**2.** The full quorum discussion in *Morton, Bliss* is as follows:

[O]ur Constitution fixes the quorum competent to transact business on a numerical basis. A majority of each House is competent to transact all business not embraced in certain special provisions requiring for action the concurrence of a greater number of votes than the number required to constitute such quorum. [citation omitted] A quorum is, then, when competent to act for all legal interests and purposes, the 'Senate,' or the 'House,' as the case may be; and whatever authority is conferred on the bodies designated by such names, or upon the General Assembly as a whole, must be regarded as fully vested, for all actual purposes, in the quorum thus constituted.... It would follow that provisions ascertaining the mode in which the body should divide, in order to complete action in any given case, whether by a mere majority or by a still greater proportion, must be interpreted primarily as applicable to the body as legally organized at the time such action is taken. If the rule is the mere majority rule, then a majority of the quorum present and acting is intended; if the rule is that of two-thirds, then two-thirds of such quorum must concur for effective action.

*Id.* at 463.

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 169–70 (5th ed. 1883) (emphasis added).

## B.

We are further persuaded that the constitutional two-thirds voting requirement demands that we reject the General Assembly's view that it lawfully overrides a governor's veto with a vote of 1 to 0 when a quorum is present. The constitution allows the legislative branch to override the executive branch—but that legislative power is limited and circumscribed by the heightened vote requirement.[3] We described the significantly important check and balance inherent in the two-thirds requirement in *Morton, Bliss:*

> The object of this provision was to create a check, operating directly on the respective Houses of the General Assembly, tending to limit the exercise of the power of creating public debt to cases where its expediency was determined as the result of a clear and solid judgment of the legislative body. Experience had shown that a mere majority does not necessarily express a conviction of that nature, but often depends on a mere accident, that, according to its occurrence, at one time or another, may reverse the conclusions of the deliberating body.... These considerations have led to constitutional provisions requiring, in certain cases, that a greater number than a mere majority should unite where acts of a certain class of a more important character than the ordinary subjects of legislation are involved.

*Morton, Bliss,* 4 S.C. at 462–63.

## C.

Plaintiff has provided research detailing well over one thousand veto override votes by one or both houses since our decision in *Smith v. Jennings.* For generations, the General Assembly followed *Smith v. Jennings* and the clear constitutional requirement—two-thirds of a house in article IV, section

---

**3.** *See also* James L. Underwood, *The Constitution of South Carolina, Volume 1: The Relationship of the Legislative, Executive, and Judicial Branches* 86 (1986) (stating the executive veto serves as a check and balance against the General Assembly's plenary power).

21 means two-thirds of the quorum. The data shows that beginning in 1980, the House of Representatives began the practice of overriding local bills with less than two-thirds of a quorum. It appears that practice became customary in the House of Representatives by the mid–1980s.

The data further reveals that in the 104 years following *Smith v. Jennings*, the Senate never declared any bill, statewide or local, to be overridden with less than two-thirds of a quorum, except for once in 1989 and once in 2006. Beginning in 2008, the Senate changed its posture and the vast majority of local bills passed as overrides were enacted without obtaining the vote of two-thirds the quorum. We conclude that what the General Assembly contends is a "long-held precedent in the Senate" is not as rooted as the General Assembly represents.[4]

In support of their defense of the veto override, the State and General Assembly offer parliamentary manuals, *Mason's Manual of Legislative Procedure* and *Jefferson's Manual of Parliamentary Practice,* which generally construe the quorum requirement in terms of "present and voting." The ability of the General Assembly to determine its procedural rules, however, is constrained where the constitution mandates a particular procedure. The parliamentary manuals cited by the State and General Assembly are replete with the recognition that their general rules may apply "in the absence of a contrary provision." See, e.g., Mason's Manual of Legislative Procedure § 503.3 ("Under the generally accepted rules of parliamentary procedure in the absence of a contrary provision...."); Mason's § 512.3 (a two-thirds vote requirement "unless otherwise specified, means two-thirds of the legal

---

4. Similarly, the dissent's efforts to support the 1 to 0 veto override fall short. The dissent posits that the General Assembly has been "voting on bills and joint resolutions" in reliance on our precedent "for over a century." We agree. As established above, the General Assembly for generations followed the clear language of our constitution ("[i]f ... two-thirds of that house shall agree to pass [the override]") in its efforts to override a governor's veto. The historical practice of the General Assembly has, in fact, mirrored our *Morton, Bliss* and *Smith v. Jennings* precedent requiring that "two-thirds of [a] quorum must concur for effective action." Today we adhere to *stare decisis* and reject the General Assembly's recently adopted practice, which circumvents and violates the constitutionally mandated two-thirds requirement for overriding a governor's veto.

votes cast, not two-thirds of the members present ....")
(emphasis added). We observe that article IV, section 21 of
the constitution specifies otherwise. In short, these parlia-
mentary authorities cannot be invoked to trump a constitution-
al provision.[5]

## II.

In sum, the two-thirds mandate in article IV, section 21 of
the South Carolina Constitution requires two-thirds of a quo-
rum. Assuming full membership, the minimum quorum in the
House of Representatives is 63 and the minimum quorum in
the Senate is 24; two-thirds of those numbers would be 42
Representatives and 16 Senators, respectively. Here, a quo-
rum was present in each house. We hold the veto override
votes of 33 to 10 in the House of Representatives and 1 to 0 in
the Senate fell short of the constitutionally mandated two-
thirds requirement. Accordingly, we hold the Governor's veto
of H. 4431 was sustained and enter judgment for Plaintiff.
Having rendered judgment for Plaintiff, the Court need not
reach the Article III, section 34 special legislation challenge.

**JUDGMENT FOR PLAINTIFF.**

PLEICONES and HEARN, JJ., concur.

BEATTY, J., concurring in a separate opinion.

TOAL, C.J., dissenting in a separate opinion.

---

5. *Mason's* and other parliamentary resource manuals provide default
rules in the absence of specific requirements "otherwise." In a sense,
these parliamentary resource manuals fill in gaps. *See Mason's* § 37.1
("All matters of procedure not governed by constitutional provisions ...
are governed by the rules of the general parliamentary law."). But
when the constitution unambiguously declares the process to be fol-
lowed, and there are no gaps to be filled, as is the case here, the
constitution controls. *See Mason's* § 6.2 ("A constitutional provision
regulating procedure controls over all other rules of procedure.");
*Mason's* § 7.1 ("Constitutional provisions prescribing exact or exclusive
time or methods for certain acts are mandatory and must be complied
with."); *Mason's* § 12.1 ("A legislative body cannot make a rule that
evades or avoids the effect of a rule prescribed by the constitution
governing it....").

Justice BEATTY.

I concur with the majority; however, I write separately to express my view that Act 308 is also unconstitutional special legislation beyond a reasonable doubt. Article III, Section 34 of the South Carolina Constitution prohibits special laws where general laws can be made applicable. There is no evidence in the record of this case that distinguishes The Board of Trustees of the School District of Fairfield County from the majority of school district governing bodies in this state; all are susceptible to fiscal mismanagement.

Further, Act 308 clearly conflicts with provisions of Title 59 of the South Carolina Code which grant authority to boards of trustees to manage and control school districts. See *S.C.Code Ann.* § 59–19–10 (2004). Budget making authority is inherent in the board of trustees' management and control mandate. Moreover, Title 59 specifically authorizes school trustees to set the salaries of teachers (§ 59–19–90(2)), charge fees (§ 59–19–90(8)), sell or lease property (§ 59–19–250), and purchase land (§ 59–19–180). These powers are manifestations of the Legislature's intent that school boards of trustees manage the finances of school districts. Act 308 is in direct conflict with general law and is therefore unconstitutional. See *Henry v. Horry County*, 334 S.C. 461, 514 S.E.2d, 122 (1999).[6]

Allegations of fiscal ineptness and mismanagement by school boards are plentiful throughout this state. Assuming that Act 308 is efficacious, its tenets could prove beneficial to the entire state, not just Fairfield County.

Chief Justice TOAL.

Respectfully, I dissent. In my opinion, the General Assembly effectively overrode the gubernatorial veto of Act 308. Accordingly, I would reach the merits of the Board's second constitutional challenge and find Act 308 is constitutional special legislation.

---

6. The dissent illuminates in part this court's history of turning a blind eye to legislative constitutional infractions when it comes to public education. I would posit that the sordid reasons for having turned a blind eye supposedly no longer exist so we should cleanse our eyes with the "moistened clay" of justice and rule accordingly. It is time to end this court-created education exception to our constitutional mandate.

## I. The Veto Override

I agree with the majority's acknowledgement that "absent a constitutional mandate providing otherwise, each house in the General Assembly determines its rules of procedure free from interference with judicial and executive branches." However, I disagree with the majority's determination that our constitution provides otherwise. The majority reads Article IV, section 21 of the South Carolina Constitution to require the affirmative vote of two-thirds of a full quorum to override a gubernatorial veto, rather than abiding by our long-standing precedent requiring the affirmative vote of two-thirds of the membership present and *acting upon the matter,* so long as a quorum is present to conduct business. The majority's approach focuses on the number of affirmative votes cast, rather than the ratio of votes constitutionally required. For instance, two-thirds of a quorum of the House equals 42 members. Under the majority's holding, a vote of 42–0 in the House is sufficient to override a governor's veto, as long as a quorum of the House is present. However, a vote of 41–1 would be insufficient to override a veto because the number of affirmative votes does not equal two-thirds of the full quorum. A vote of 41–1 is a ratio that far exceeds two-thirds of the votes cast. In my view, this is contrary to the plain language of our constitution and contrary to our opinions thus far interpreting constitutional vote requirements.

The concept that a vote ratio prescribed by our constitution applies only to those members voting in the presence of a quorum dates back to 1873. In *Morton, Bliss & Co. v. Comptroller General,* we stated, "If the rule is the mere majority rule, then a majority of the quorum present *and acting* is intended; if the rule is that of two-thirds, then two thirds of such quorum [present and acting] must concur for effective action." 4 S.C. 430, 463 (1873) (emphasis added). This Court specifically applied this concept to the constitutional provision at issue in this case in *Smith v. Jennings.* In that case, the Court determined "[w]hen the Constitution speaks of 'two-thirds of that house' as the vote required to pass a bill or joint resolution over the veto of the governor, it means two-thirds of the house as then legally constituted *and acting upon the matter." Smith v. Jennings,* 67 S.C. 324, 328, 45 S.E. 821, 823 (1903) (emphasis added).

The General Assembly has since relied upon our holdings in *Morton, Bliss* and *Smith v. Jennings* when establishing its rules. While debating a concurrent resolution in 1984, a point of order was raised concerning the amount of votes required to pass the resolution. H.R. Con. Res. 3947, 106th Gen. Assem., 1st Reg. Sess. (S.C.1984). It was urged that the House adopt the *Smith* veto override standard that two-thirds of the house means "two-thirds vote of those present and voting, a quorum being present." *Id.* Following a discussion on the matter, the Speaker of the House of Representatives ruled that "it takes two-thirds of those present and voting to adopt a Resolution." *Id.* Along these same lines, the current Rules of the Senate and Rules of the House provide that a veto may be overridden by a two-thirds vote of the members present and voting. Rules of the Senate of South Carolina 50 (2009); Rules of the House of Representatives 10.3 (2010–11).

This Court's precedent combines with parliamentary authority to solidify the concept that legislation may be passed as long as a quorum is present and those voting meet the constitutionally prescribed ratio of votes required. *Mason's Manual of Legislative Procedure,* the preferred parliamentary authority of the South Carolina House of Representatives, states "[t]he requirement of a two-thirds vote, unless otherwise specified, means two-thirds of the legal votes cast, not two-thirds of the members present, or two-thirds of all the members." *Mason's* § 512.3 (2000). The majority quotes this authority, but finds that our constitution specifies otherwise. In my view, the only means of finding a different specification in our constitution is to ignore the constitutional interpretation provided in *Morton* and *Smith v. Jennings,* which focuses on those voters acting upon the matter rather than the threshold number of votes required.

The parliamentary rules of the United States Congress additionally support the General Assembly's "voting and present" requirement. The preferred parliamentary manual of the South Carolina Senate is an amalgamated version of the United States Constitution and Jefferson's *Manual of Parliamentary Practice,* which contains commentary on the provisions of these documents written by the United States Congress. The Senate of South Carolina, Constitution of the United States and Jefferson's Manual (1989) (unpublished

pamphlet, on file with the South Carolina Senate). In this document, the commentary of Article I, section 5 of the United States Constitution [7] recounts events that took place in the late nineteenth century that "established the principle that a quorum present made valid any action by the House, although an actual quorum might not vote." *Id.* § 54. The United States Supreme Court sustained that principle in *United States v. Ballin,* 144 U.S. 1, 12 S.Ct. 507, 36 L.Ed. 321 (1892).

For over a century, the General Assembly has relied upon our interpretation of Article IV, section 21 and the common standards of parliamentary procedure when voting on bills and joint resolutions. The doctrine of *"[s]tare decisis* exists to 'insure a quality of justice which results from certainty and stability.'" *State v. One Coin–Operated Video Game Mach.,* 321 S.C. 176, 181, 467 S.E.2d 443, 446 (1996) *(quoting McCall v. Batson,* 285 S.C. 243, 256, 329 S.E.2d 741, 747 (1985) (Chandler, J., concurring)). Therefore, in the interest of promoting the stability of existing laws, and with recognition that the execution of parliamentary procedure is generally within the purview of the legislature, I would find that when a quorum of the voting body is present, it is equipped to conduct business, and as such, the General Assembly effectively overrides a gubernatorial veto when two-thirds of the votes cast affirm the passage of that bill.

## II. Special Legislation

Because I believe the General Assembly validly passed Act 308, I find it necessary to reach the Board's second constitutional challenge. The Board argues that Act 308 is unconstitutional under Article III, section 34(IX) of the South Carolina Constitution because it is a special, or local, law that conflicts

---

7. Article I, section 5 of the United States Constitution requires a "Quorum to do Business." U.S. Const. art. I, § 5. Between 1861 and 1891, a quorum in the United States Congress was determined only by noting the number of members voting. The Senate of South Carolina, Constitution of the United States and Jefferson's Manual § 54. This method of determining the existence of a quorum encouraged a practice where members would refuse to vote in order to break the quorum and "obstruct the public business." *Id.* In 1890, the Speaker of the House directed the clerk to enter on the Journal as part of the record of votes the names of the members present, but not voting. Since, the standard method of ascertaining the presence of a quorum is to count all members present, even if not voting. *Id.*

with the general law; or alternatively, that it is a special law where a general law can be made applicable. I do not believe that Act 308 conflicts with an existing general law. Further, in my view, the history of special legislation addressing the manner and means of school district budget preparation in individual counties precludes a finding that a general law could be made applicable statewide. Therefore, I would find that Act 308 complies with Article III, section 34(IX) of the South Carolina Constitution, and is wholly constitutional.

Article III, section 34 of the South Carolina Constitution prohibits the General Assembly from enacting local laws in several enumerated instances. Of note in this case, subsection IX of that section restricts the passage of local laws "where a general law can be made applicable." S.C. Const. art. III, § 34(IX). This provision not only prevents the enactment of special legislation where a general law is already applicable, but also where an applicable general law may be created. *Horry County v. Horry County Higher Educ. Com'n,* 306 S.C. 416, 418, 412 S.E.2d 421, 423 (1991) (citations omitted). The purpose of restricting local or special legislation is to promote uniformity in the laws of the state where possible, and to "avoid duplicative or conflicting laws on the same subject." *Med. Soc'y of S.C. v. Med. Univ. of S.C.,* 334 S.C. 270, 279, 513 S.E.2d 352, 357 (1999). Also pertinent to this issue, subsection X of Article III, section 34 states that "nothing contained in this section shall prohibit the General Assembly from enacting special provisions in general laws." S.C. Const. art. III, § 34(X).

This Court is deferential to the General Assembly when determining the constitutionality of a local law and will not declare that law unconstitutional "unless its repugnance to the Constitution is clear beyond a reasonable doubt," *Med. Soc'y of S.C.,* 334 S.C. at 279, 513 S.E.2d at 357, or "there has been a clear and palpable abuse of legislative discretion." *Sirrine v. State,* 132 S.C. 241, 248, 128 S.E. 172, 174 (1925), overruled on other grounds, *McCall v. Batson,* 285 S.C. 243, 329 S.E.2d 741 (1985). Even greater deference is afforded the General Assembly when evaluating local laws relating to school matters. *See McElveen v. Stokes,* 240 S.C. 1, 10, 124 S.E.2d 592, 596 (1962). When local legislation involves public education, the constitutional restriction on the enactment of local laws must

be viewed in light of the General Assembly's Article XI duty to "provide for the maintenance and support of a system of free public schools open to all children in the State. . . ." S.C. Const. art. XI, section 3; *McElveen*, 240 S.C. at 10, 124 S.E.2d at 596. In *McElveen v. Stokes*, this Court summarized this jurisprudence as follows:

> In determining whether a statute pertaining to school matters is obnoxious to subsection IX of Section 34, Article III, it is well settled that this subsection must be construed in connection with the applicable provisions of Article XI, which deal with education and various school matters. It is clear from a study of these cases and the constitutional provisions that the scope of the legislative power is much broader in dealing with school matters than is the scope in dealing with various other subjects.

*Id.* Accordingly, this Court traditionally sustains local laws relating to the state's public education system. *Bradley v. Cherokee Sch. Dist.*, 322 S.C. 181, 470 S.E.2d 570 (1996); *Smythe v. Stroman*, 251 S.C. 277, 289, 162 S.E.2d 168, 173 (1968); *Moseley v. Welch*, 209 S.C. 19, 33, 39 S.E.2d 133, 140 (1946); *Walker v. Bennett*, 125 S.C. 389, 118 S.E. 779 (1923).

The constitutional prohibition against local laws not only includes local laws that conflict with an existing general law, but also local laws that are passed when a general law could be made applicable. *Horry County*, 306 S.C. at 418, 412 S.E.2d at 423. Therefore, to arrive at whether a general law could be made applicable, this Court has stated:

> There must . . . be a substantial distinction having reference to the subject matter of the proposed legislation, between the objects or places embraced in such legislation and the objects and places excluded. The marks of distinction upon which the classification is founded must be such, in the nature of things, as will in some reasonable degree, at least, account for or justify the restriction of the legislation.

*Id.* Thus, "the General Assembly must have a 'logical basis and sound reason' for resorting to special legislation." *Id.* (quoting *Gillespie v. Pickens County*, 197 S.C. 217, 14 S.E.2d 900 (1941)).

### A. Whether Act 308 is a Special Provision in a General Law

The State and General Assembly first argue that Act 308 is a special provision in a general law, acceptable under subsection X of Article III, section 34.[8] Therefore, they argue, Act 308 is not subject to the prohibition against local laws where general laws can be made applicable found in subsection IX of Article III, section 34. I disagree.

Local laws and general laws are distinctly different session laws and are treated as such in the Statutes at Large published each year. The Statutes at Large, a publication of the Acts and Joint Resolutions passed by the General Assembly during a calendar year, is divided into two parts. The first part contains general and permanent laws that will ultimately be codified in the South Carolina Code. The second part contains local and temporary laws which are not codified, but are executed as session laws. It is my opinion that where the constitution states "nothing contained in this section shall prohibit the General Assembly from enacting special provisions in general laws," S.C. Const. art. III, § 34(X), it is referring to special provisions that are contained within the codified general law. These special provisions may make a general law's effect different in certain counties, but they may not exempt a county from the general law's entire operation. *Horry County*, 306 S.C. at 419, 412 S.E.2d at 423.

Here, Act 308 cannot be fairly construed as a special provision in a general law. The General Assembly passed Act 308 as an amendment to a local law relating to the manner of selection of the Board of Trustees of the Fairfield County School District. It will not be codified in Title 59 of the South Carolina Code as will other acts and resolutions involving education. If this Court found that acts passed as local laws can be considered special provisions in general laws, subsection X of Article III, section 34 would be left with few limitations. Such a reading would permit subsection X to essentially swallow subsection IX's prohibition on local laws where general laws can be made applicable. I do not believe

---

**8.** "[N]othing contained in this section shall prohibit the General Assembly from enacting special provisions in general laws." S.C. Const. art. III, § 34(X).

this to be the intention of the constitution's drafters, and therefore, I believe Act 308 should be analyzed under the constraints of Article III, section 34(IX).

*B. Whether Act 308 Directly Conflicts with a General Law*

This Court has on two occasions invalidated a local law involving county school districts because of a conflict with existing general law. In *Smythe v. Stroman,* a provision in the act at issue provided that a newly consolidated school district would not assume the bonded indebtedness of its original school districts. 251 S.C. at 282, 162 S.E.2d at 170. The general law required that when school districts are consolidated, the consolidated district shall take on the liabilities of the original districts. *Id.* Finding that provision to be in direct conflict with the general law, this Court struck the provision from the act, while upholding the remainder of the act as a special provision in a general law under subsection X of Article III, section 34. *Id.* at 289, 162 S.E.2d at 173.

In *Kearse v. Lancaster,* a school district had been previously created by consolidating the Olar and the Three–Mile districts. 172 S.C. 59, 61, 172 S.E. 767, 768 (1934). The Three–Mile district wished to withdraw from the consolidated district and re-establish itself as it formerly existed. *Id.* The act at issue allowed only those residing in the Three–Mile district to vote in an election to determine the question of whether it should be withdrawn from the consolidated district. *Id.* This Court found that the local law conflicted with the general law that addressed school incorporation, and as such, the act violated subsection IX of Article III, section 34. *Id.* at 63, 172 S.E. at 769.

In my opinion, the South Carolina Code does not include a general law that explicitly vests budget-making authority with a school district's board of trustees. The Board cites to several provisions within Title 59 of the South Carolina Code to support its contention there is a direct conflict between Act 308 and the general law. Of note, section 59–19–10 provides that "[e]ach school district shall be under the management and control of the board of trustees . . . ." S.C.Code Ann. § 59–19–10 (2004). Act 308 vests sole budget-making authority with a finance committee and requires its approval for a list of enumerated expenses. H. 4431, Act 308 of S.C. Acts 2010.

Outside of this function, however, the ability to execute the budget provisions made by the finance committee and the duty to establish the policy of the school district remains with the Board. *Id.* Act 308 does not affect the Board's ability to promulgate rules and regulations regarding standards of achievement or conduct within the district, to call meetings, or generally, to control the educational interests of the district. Therefore, I do not believe Act 308 squarely conflicts with section 59–19–10 of the Code.

The general law also provides that school trustees have the power to manage and control school property, S.C.Code Ann. § 59–19–90(5) (2004), to provide suitable school houses, *Id.* § 59–19–90(1), and to purchase, rent, and lease supplies and equipment necessary for the operation of the public schools of the district, *Id.* § 59–19–130. Again, Act 308 does not conflict with any of these laws because under the act, the finance committee is charged only with preparing the annual budget and approving any fiscally related activity of the district. The Board continues to be the body that acquires the goods necessary for the upkeep and operation of its schools.

The Board has not directed this Court to a provision in the Code that explicitly grants a board of trustees the budget-making power that Act 308 has now taken away. For the reasons stated above, I do not believe that Act 308 conflicts with an existing general law.

### C. Whether a General Law Can be Made Applicable

In determining whether a general law could be fashioned to standardize school district budget-making statewide, this Court's decision in *Moseley v. Welch* is instructive on both points of fact and law. 209 S.C. 19, 24, 39 S.E.2d 133, 135 (1946). In that case, plaintiffs sought to have declared invalid an act that would abolish the Williamsburg County Board of Education, replacing it with a new board consisting of seven members to be appointed by the governor upon the recommendation of the local delegation from that county. *Id.* at 24, 39 S.E.2d at 136. In pertinent part, the act empowered the new board with the final authority to approve budgets submitted by trustees in the individual districts within the county, to set teacher salaries, to borrow funds, and to order the construction and repair of buildings. *Id.* at 25, 39 S.E.2d at 136.

In that case, it was urged that the act was a special law where a general law could be made applicable. *Id.* at 27, 39 S.E.2d at 137. This Court explained that the chapter in the 1942 South Carolina Code containing general school law was followed by a chapter containing special legislation relating mostly to the fiscal affairs of the schools in each of the forty-six counties in the state. *Id.* This Court recognized that the General Assembly's opinion that "conditions in the various counties ... preclude uniformity of treatment in relation to the administration of school affairs .... is entitled to much respect and in doubtful cases should be followed." *Id.* at 27–28, 39 S.E.2d at 137. The Court further observed that, although public education is a matter of general concern across the state, the act in question only related to the fiscal operation of the schools, and did not invade the general field of education. *Id.* at 30, 39 S.E.2d at 138. Specifically, the act did not

> regulate the textbooks to be used or the subjects to be taught ..., the qualifications of teachers or the manner in which they shall be elected, school attendance or enrollment of pupils, the length of the school term, or various other matters pertaining to the general field of education. The general law regulating all these subject areas is left undisturbed.

*Id.* This Court ultimately found the act was constitutional as a special provision in a general law. *Id.* at 28–29, 39 S.E.2d at 138.

The General Assembly, which has been granted wide authority to legislate the field of education, has chosen not to enact a law that explicitly vests budget-making authority with district boards of trustees. Because the general law is silent on the matter, local legislation in several counties specifically grants this authority to a district's board of trustees. *See, e.g.,* H. 3655, Act 578 of S.C. Acts 1984 ("In addition to the powers and duties of the board of trustees of the School District of Calhoun County provided by the law, the board shall prepare and adopt the budget for the operation of the district...."); H. 3069, Act 268 of S.C. Acts 1977 ("The county board of education (board) shall be granted all of the powers and charged with all of the duties otherwise provided

by law and shall have executive, financial and administrative control of the public schools in the school district....").

Since this Court's holding in *Moseley,* the manner in which school district budgets are formulated and approved continues to vary county by county. For instance, in Aiken County, the board of trustees has the authority to prepare the annual budget; however, if the proposed budget exceeds the budget of the previous year, the Aiken County Legislative Delegation must approve it. H. 3069, Act 268 of S.C. Acts 1977. In Anderson County, the board of trustees of each district prepares the annual budget and then recommends to the Anderson County Board of Education the amount of tax mileage, H. 3589, Act 96 of S.C. Acts 2009, while in Orangeburg County, the board of trustees directly notifies the county auditor of the tax levy needed, H. 2788, Act 245 of S.C. Acts 1983. In Horry County, the budget may be prepared by the board of trustees, superintendents, *or* principals of the several schools, who are then to submit the prepared budgets to the county board of education. S.492, Act 239 of S.C. Acts 1983 (emphasis added). Thus, by passing local laws in this area instead of enacting a general law that standardizes the school district budget-making process, the General Assembly has signaled its belief that a tailored approach best meets the needs of the varied districts within our state.

In recognition of the General Assembly's constitutional duty to provide for the maintenance and support of a public school system, I believe the following statement in *Moseley* aptly states my opinion on this issue: "[i]t is exceedingly doubtful whether a general law, uniform in operation throughout the State, regulating ... the extent of the control which should be vested in the county boards of education, could be made applicable." *Moseley,* 209 S.C. at 28, 39 S.E.2d at 138. I would find Act 308 is sustainable under Article III, section 34(IX). Therefore, I would enter judgment for the Defendants and Defendant–Intervenors.